# CHARLESTOWN.

STATE *v.* SMITH.

Submitted June 17, 1884—Decided September 27, 1884.

1. An indictment for murder in the form prescribed by section 1 of chapter 118 of the Acts of the Legislature of 1882 is a good and valid indictment. (p. 817.)

2. An indictment for murder may contain two or more counts, in each of which the person alleged to have been murdered may be described by a different name. (p. 817.)

3. Each of the several counts in an indictment is regarded as a separate indictment, and is supposed to present a separate and distinct offence.  (p. 820.)

4. If the indictment contains different counts, which are in fact for separate and distinct offences, and this fact appears on the opening of the cause, or at any time before the jury are sworn for the trial thereof, the court may quash the same lest it may confound the prisoner in his defence, or prejudice his challenges of the jury ; and in such case, if the defect is discovered after the jury are sworn and before the verdict is found the court may require the prosecutor to make his election on which charge he will proceed.  (p. 818.)

5. The subject of election is addressed to the judicial discretion of the judge who presides at the trial ; but if the prosecutor in any case be put to his election, he should be required to make his election before the prisoner opens to the jury his defence.  (p. 820.)

6. If the different counts in an indictment for murder purporting to be for distinct and separate offences, are inserted in good faith for the purpose of meeting a single charge, the court will neither quash the indictment, nor compel the prosecutor to elect upon which count he will proceed to trial.  (p. 821.)

7. The court will not set aside a verdict on the ground that it is contrary to the evidence, unless the evidence be plainly insufficient to warrant the verdict ; and the court will only set aside a verdict as contrary to the evidence where the jury have plainly decided against the evidence, or without evidence.  (p. 825.)

8. On a trial for murder the prisoner moved the court to set aside the verdict upon the ground that after the judge and the defendant. had left the court-room at the noon recess, the prosecuting attorney and two other persons had a conversation in the presence, and within the possible hearing of the jury, who had not yet left their seats, in regard to the effect of certain material evidence which had been introduced on the trial, but it did not appear that any part of such conversation had been heard by any of the jury, which motion the court overruled :  HELD :

The circuit court did not err in overruling said motion.  (p. 828.)

WOODS, JUDGE, furnishes the following statement of the case :

At the March term, 1884, of the circuit court of Taylor county, Carter Smith was indicted for the murder of one George McDaniel.   The indictment contained two counts, in the precise form prescribed by section 1 of chapter 118 of the Acts of the Legislature of 1882.   In the first count he was

charged with the murder of George McDaniel, on the —— day of December, 1883; in the second count he was charged with the murder of George McDonald, on the —— day of December, 1883. On the 31st of March, 1884, the defendant moved the court to quash the indictment and each count thereof, which motion was overruled. He then moved the court to "require the prosecuting attorney to elect as to which count of the indictment the prisoner should be tried upon," which motion was also overruled. The defendant then pleaded not guilty, and the issue was tried by a jury, who on the 3d day of April, 1884, returned a verdict "finding the defendant guilty of murder in the second degree, as charged in the first count of the indictment." And thereupon the defendant moved the court to arrest the judgment upon the verdict, and to set the same aside, and grant him a new trial, on account of alleged improper conduct on the part of the prosecuting attorney, and because the same was contrary to the law and the evidence, which motions the court overruled, and the defendant excepted and filed his two bills of exceptions, "No. 1" and "No. 2." The court thereupon rendered judgment on the verdict that the defendant be imprisoned for ten years, in the penitentiary.

To this judgment the defendant obtained a writ of error.

Four grounds of error are assigned by the defendant.

1st. In refusing to quash the indictment and each count thereof.

2d. In refusing to require the State to elect upon which count the defendant should be tried.

3d. In refusing to set aside the verdict for the reasons already stated, and

4th. In refusing to arrest the judgment because the indictment was so defective that no legal conviction could be had under it.

*J. W. Mason* for plaintiff in error.

*J. T. McGraw* for the State.

WOODS, JUDGE:

The form of indictment used in this case is in the exact words prescribed by section 1 of chapter 118 of the Acts of

the Legislature of 1882, and was before this Court for consideration in the case of the *State* v. *Guenther Schnelle*, 24 W. Va., in which we held that the statute prescribing that form of indictment was constitutional, and that such indictment was valid. We have not been able to discover any reason to induce us now to reach a different conclusion But it is insisted by the defendant's counsel, that the indictment was defective because it united two different felonies in the same indictment; in the first count charging the defendant with the murder of George McDaniel, and in the second count charging him with the murder of George McDonald. The introduction of several counts in an indictment for felony is now too well settled to be called in question. These different counts are generally intended to charge the commission of the same offence with such varied description of the person or property, which is the subject of the offence, or of the title or ownership of the property, or of the means, instruments and agencies by which the offence was committed as will meet the various aspects in which the evidence may present itself upon the trial. In cases of burglary and larceny, the ownership of the dwelling-house broken and entered, or of the property stolen, may be laid in different counts to be in different persons; so in an indictment for forgery, a count may properly be inserted charging the accused with uttering the forged writing as true knowing the same to be false; so also an indictment may contain a count for larceny, others for receiving stolen goods, knowing them to have been stolen, and others for aiding another to conceal stolen goods, knowing them to have been stolen. *Dowdy* v. *Commonwealth*, 9 Leigh 727; *Mowbry* v. *Commonwealth*, 11 Leigh 643; *The People* v. *Rynders*, 12 Wend. 429. So also it has been held that an indictment for murder may contain a count charging the accused with the murder of John Moore, and also a count for the murder of a person whose surname was Moore, but whose christian name was to the jurors unknown; and also a third count charging the accused with the murder of an adult male person whose name was to the jurors unknown—*Mershon* v. *The State*, 51 Ind. 14.

In all cases, however, in which there are two or more

counts in the indictment, whether there is actually one offence or several, each count is regarded as a separate indictment and is supposed to represent a distinct offence. *Lenkon's Case*, 9 Leigh 612. But I have been unable to find in Virginia or in this State any case in which more than one criminal transaction was embraced in a single indictment for felony, although in many cases where the offences are of the same character, differing only in degree, the indictments have contained two or more counts, in which the same transaction in the form of distinct and separate felonies, are represented. But as in every such case the separate counts are regarded as separate indictments for distinct offences, it will in most cases be impossible for the court from an inspection of the indictment to determine, whether the various counts represent the same transaction under different forms, or whether they in fact represent wholly different and distinct offences. If all, or any of such counts are perfect upon their face, a demurrer to or motion to quash the indictment for the supposed misjoinder of counts must be overruled, although some of these counts may in fact represent separate and distinct offences, for the reason that this fact can only be made to appear from the evidence introduced on the trial. "It however it appear before the defendant has pleaded, or the jury are sworn, that he is to be tried for separate offences, it has been the disposition of the judges to quash the indictment lest it should confound the prisoner in his defence, or prejudice him in his challenge of the jury, for he might object to a juryman trying one of the offences, though he might have no reason to do so in the other." *Young* v. *The King*, 3 T. R. 106, and *Dowdy* v. *Commonwealth, supra.* And if the judge who tries the cause does not discover the defect in time to quash the indictment, he may put the prosecutor to make his election on which charge he will proceed, but if the case has gone to the length of a verdict, it is no objection in arrest of judgment. If it were, it would overturn every indictment which contains several counts. *Young* v. *King, supra.* In the case of *Dowdy* v. *Commonwealth, supra,* the defendant was indicted for the larceny of "eleven hundred and forty pounds of tobacco of the value of one hundred dollars." The indictment contained ten counts. The first was

a common count for larceny stating the owner to be a person to the jurors unknown; the next six were for receiving stolen tobacco knowing it to have been stolen; and the last three for aiding " I. B." in concealing stolen tobacco knowing it to have been stolen. In three of the counts the property is stated as the property of " O," in other three as the property of " G," and in the other three as the property of a person to the jurors unknown. In three of the six counts for receiving, the property is stated to have been received of "I. B." and in the other three of a person to the jurors unknown. All of the counts except the first were found under section 19 of chapter 192 of the Code which is in these words: "If any free person buy or receive from another person, or aid in concealing any stolen goods or other thing knowing the same to have been stolen, he shall be guilty of larceny thereof, and may be proceeded against, although the principal offender be not convicted." Before the prisoner pleaded to the indictment, he moved the court to quash the same, and each count thereof, which motion was overruled. He then demurred to the indictment which was also overruled. He then pleaded "not guilty" and before the jury were sworn and before they were charged, he moved the court to compel the attorney for the commonwealth to elect under which count or counts of the indictment he would prosecute the prisoner, but the court overruled this motion also, and permitted the said attorney to prosecute under the whole indictment. The prisoner was tried and found guilty. Upon a writ of error the court of appeals of Virginia, held, that there was no error in overruling the demurrer, and in overruling the motion to quash the indictment and each count thereof, and in overruling the motion to compel the attorney for the commonwealth to elect under which count or counts he would prosecute the prisoner. Moncure, Judge, delivering the opinion of the court in this case, quotes approvingly the language of the court of errors in *Kane* v. *The People*, 8 Wend. 211: " In cases of felony where two or more distinct and separate offences are contained in the same indictment, the court in its discretion may quash the indictment, or compel the prosecutor to elect upon which charge he will proceed. But it is every day's practice to charge a felony in

different ways in several counts for the purpose of meeting the evidence as it may come out upon the trial; each of the counts on the face of the indictment purports to be for a distinct and separate offence, and the jury very frequently find a general verdict on all the counts, although only one offence is proved; but no one ever supposed, that formed a ground for arresting the judgment. If the different counts are inserted in good faith for the purpose of meeting a single charge, the court will not even compel the prosecutor to elect." In that case the court held each count in the indictment to be a good count, "and each being for a felony, there was no misjoinder, and the demurrer was rightly overruled. Whether the court should have quashed the indictment or compelled the prosecutor to elect upon which count he would proceed depends upon whether the charges in the different counts are actually distinct." The same principles were announced by the supreme court of judicature of Indiana in *Mershon* v. *The State, supra.* In that case Warden, J., delivering the opinion of the court, said, speaking of the case under consideration, " that different counts charging felonies may be joined in the same indictment, and that it was clear the court did not err in overruling the motion to require the prosecutor to elect on which count he would proceed."

The general rule in the trial of felony cases is, that the court will permit the prosecutor to give evidence of only one felonious transaction, except where authorized by statute; and that if the prosecutor in any charge of felony should offer evidence tending to prove two distinct charges of felony he would be stopped immediately by the presiding judge, and directed to make his election upon which single charge of felony he intended to proceed. 1 Bish. Cr. Pro. §§ 208, 210, quoting Tindal, C. J., in *O'Connell* v. *Reg,* 11 Cl. & F. 155, 241. The doctrine of election addresses itself to the judicial discretion of the judge who presides at the trial, and if the prosecutor in any case be put to his election, it is plain, that as a general rule he shall be required to make his election before the prisoner opens to the jury his defence. 1 Bish. Cr. Pro. § 213. But when it appears on the opening of the trial or during its progress, that there is no more than one criminal transaction involved, and that the joinder of the

different counts is meant to meet only the various aspects in which the evidence may present itself, the court will not restrict the prosecuting officer to particular counts, and will suffer a general verdict to be taken on the whole indictment. Applying these principles of law to the case under consideration, we are of opinion that the prisoner's motions to quash the indictment, and to require the prosecuting attorney to elect as to which count of the indictment upon which the prisoner should be tried, were properly overruled. Both counts of the indictment were perfect, they were identical in every respect, except that in the first the deceased is called George McDaniels, and in the second, George McDonald. Even without the aid of the evidence, the court upon a simple suggestion, that this difference was meant only to meet the various aspects in which the evidence might present itself would have been warranted in overruling said motions; but when aided by the evidence adduced on the trial, all of which is before us in the defendant's first bill of exceptions, the propriety and correctness of the court's ruling upon these motions are placed beyond question; inasmuch as the testimony of the defendant himself as well. as that of every other witness conclusively shows, that there was in fact only one felonious transaction mentioned in the indictment, and the name of the deceased was George McDaniel and not McDonald, and the jury accordingly so found by their verdict when they "find the defendant guilty of murder in the second degree as charged in the first count of the within indictment," for this was equivalent to finding him not guilty upon the second count which charged him with the murder of George McDonald. 2 Va. Cases 235; 1 Bish. Cr. Pro. § 837. For the reason hereinbefore given, the court did not err in overruling the defendant's motion in arrest of judgment.

It remains for us to consider whether the court erred in refusing to set aside the verdict and grant the defendant a new trial for any of the grounds alleged in his two bills of exceptions. The grounds alleged in the first bill of exceptions are, that "the verdict was contrary to the law and the evidence." That the verdict was not contrary to law we have already shown, and it is not necessary to further consider

that question. All the testimony adduced on the trial is set forth with unusual perspicuity in the first bill of exceptions, and we may remark that it rarely happens that so many witnesses, all present at the same time and place witnessing a fatal affray between two combatants, are able to testify to all that occurred with so little material discrepancies in their statements. In substance they all state, that on the 20th day of December, 1883, about half-past seven o'clock in the evening, the defendant, who was a barber, was engaged in his shop in Grafton in cutting John Cain's hair; that while so engaged the deceased came up to the door of the shop and leaned against the door and addressed some words to one Link Saulsbury, who was in the shop, saying something about putting a chain around Saulsbury's neck, and that he could make his fortune traveling around the country with him as a dog. All agree that this conversation was addressed to Saulsbury and not to defendant; that defendant made to deceased some statement, in substance, that his (deceased's) mother didn't know him, and that his wife didn't know him. Deceased replied: "When you talk about my wife you talk about me." To which defendant replied: "God damn you and your wife." Deceased then said to the defendant: "I can whip you," and pulled off his coat and threw it on the floor behind him and advanced two steps towards defendant and threw up his right hand; defendant advanced about two steps and threw up his left hand and made a thrust at the deceased with the scissors, then held in his right hand. None of the witnesses were able to state, whether that thrust pierced the deceased or not. This thrust is described by one witness as being a straight forward thrust, the scissors being held on the thumb and second finger of the right hand, the palm of the hand being upward, and the forward motion of the arm being in a straight line from about the top of the abdomen; another described it in the same way, except that the prisoner's hand was at his side when the thrust was made. About this time Pierce and Link Saulsbury interfered as if to part them and crowded deceased into the corner, who turned, ran to the washstand, picked up the washbowl and threw it, hit Pierce Saulsbury on the head with it and broke the bowl in pieces; a scuffle then ensued, and deceased

had prisoner down in the corner; had him by the throat, and struck at him. Deceased got up off prisoner and ran out of the shop; in about a minute deceased came back for his coat and leaned against the door of the shop and said: "I'm struck, I'm gone, I'm gone." Pierce Saulsbury then struck him in the jaw with his fist-and knocked him down; defend-ran around and raised his foot to kick him; someone told him not to kick and he did not, but prisoner took him by the wrist, and Link Saulsbury by the foot, and dragged him into the street, where in a few minutes he died. The de-fendant's testimony, given on his own behalf, fully corrobo-rated the testimony of all the other witnesses. He says, "I stopped cutting the boy's hair and started to open the door to put him out. He threw up his hand as if to hit me. I had the scissors in my right hand. I threw up my left hand and punched at him with the scissors, but I did not touch him with the scissors. I am sure of that. I did not reach McDaniels when I struck at him with the scissors. I only intended to scare him back when I punched at him. I did not stab McDaniels in the corner. I did not stab him at any other place or with any other instrument. I had the scissors in my hand when McDaniel grabbed me and ran me back across the room. I do not remember whether I had them when I was down in the corner or not, but I do not think I did."

The testimony of three physicians who made the *post mortem* examination of the deceased, shows beyond question that the death of the deceased was caused by a punctured wound on the left side between the seventh and eighth ribs passing upwards, inwards and backwards, and no other mark of external violence was found upon his body. Upon opening the chest the cavities were found enormously dis-tended with blood. The internal wound where it entered the pleura was about one inch higher than the external wound. The wound was into the -pleura, through the pericardium, and into the right side of the heart, about one inch from the apex. This wound in their opinion caused McDaniel's death. The wound was made with a compara-tively blunt instrument, (and being shown the pair of scissors afterwards admitted in evidence) they were of opinion the

wound could have been made with the scissors shown them.
The heart was taken out, preserved and produced in evi-
dence on the trial, with the wound in the right ventricle.
They testified that such a wound in a majority of cases
would cause instant death, and that where death is not the
instantaneous result from the shock, the effect would be
manifested by fainting, trembling, falling down, &c.; that
there was about a gallon of blood found in the cavities, and
this would be sufficient to produce death by suffocation in a
short time.

Even a very cursory examination of this evidence will show
that the deceased came to his death by a mortal wound
received some time during that affray in that barber shop,
and that not until after the struggle between the defendant
and McDaniel was over, and he returned and leaned against
the front door of the shop, saying, "I'm struck, I'm gone,
I'm gone," did any other person than the defendant punch,
thrust, strike at the deceased or offer to do so, no instru-
ment capable of making such a wound was seen, or heard of,
and no such instrument in the hand of any person present
at the time, except in that of the defendant.   While the pre-
cise moment when the wound was inflicted was left uncer-
tain by the other witnesses, yet their testimony made it
probable in the highest degree, that it was done when he
took about two steps towards deceased, threw up his left
hand, and thrust at him with the scissors in his right hand.
But this doubt is almost entirely removed by the testimony
of the defendant himself, when he testified that he "did not
stab McDaniel in the corner; that when he punched at him
with the scissors he only intended to scare him back."   All
the testimony shows that when he made this fatal thrust
with the scissors, which proved to be a mostly deadly instru-
ment, he was not in peril of even an ordinary assault; the
only provocation given, were angry words with a threat "to
whip him," and the only evidence of any apparent purpose
to carry this threat into execution, was the act of throwing
off his coat, and advancing two steps from the door towards
defendant, and raising up his right arm, while the defendant
who was not near enough to him to be struck by him, if
such was his purpose, left the position where he stood and

advanced about two steps towards deceased, and throwing up his left hand, thrust at the deceased with his right hand then holding the fatal scissors. If the mortal wound was then inflicted, the defendant was not then in imminent peril of his life, or of some great bodily harm, nor had he any reasonable or probable ground to believe that he was in such peril, or that any such wrong was intended; nor was there any actual assault made upon him to excuse or justify him in inviting the affray and going out to meet his adversary and stabbing him to death, whether he actually intended to do so or not. He used towards deceased the first insulting words which passed between them, and instead of trying to avoid an affray, advanced to meet it, and before his adversary struck a single blow, or offered to do so, he made the thrust which in all probability cost the deceased, his life. Without sufficient cause or excuse he used a dangerous weapon, and he must be held to have intended the probable result of his wrongful act; from such an act, committed with such a weapon in the absence of all provocation, or upon very slight provocation, the law will imply malice, and the crime is murder. *Hill's Case*, 2 Gratt. ——. With this evidence before them the jury found the defendant guilty of murder in the second degree. From these facts the jury must have been satisfied that the deceased came to his death, by a stab with the scissors in the hand of the defendant, without any adequate provocation, or reasonable excuse therefor, and that all the elements necessary to constitute the crime of murder, entered into and accompanied the act. In every trial for murder the jury, and not the court, are the judges of the weight of the evidence as to what degree of murder, if any, it proves; and where evidence has been given to the jury which tends to prove the facts in issue, or where the evidence consists of circumstances and presumptions, a new trial will not be awarded merely because the court if on the jury would have given a different verdict; to warrant the court in granting a new trial in such cases the evidence should be plainly insufficient to warrant the finding of the jury, and the court will only set aside a verdict because it is contrary to the evidence, where the jury has plainly decided against the evi-

dence, or without evidence. *State* v. *Abbot*, 20 W. Va. 741; *Hill's Case*, 2 Gratt.; *Grayson's Case*, 6 Gratt. 712. In the case under consideration the evidence tends strongly to show that the defendant was guilty of murder, and we cannot say that this evidence was plainly insufficient to warrant the finding of the verdict. On the contrary we think the verdict was in accordance with, and not contrary to the evidence, and the circuit court did not err in overruling the defendant's motion to set the same aside on the ground it was contrary to the law and the evidence.

Did the court err in refusing to set aside the verdict, because of the matter alleged in the defendant's second bill of exceptions? The ground relied upon, in this bill of exceptions is certain alleged misconduct on the part of the prosecuting attorney in the presence of the jury, after the prisoner and the judge had left the court room while the jury were in their seats, and before the jury were taken into the actual custody of the officers having them in charge. The alleged misconduct consisted in the prosecuting attorney having a conversation with F. B. Blue and Charles Sinsel in the presence and hearing of the jury with the heart of the deceased in their hands, in regard to the direction of the wound as it penetrated the body of deceased, and pierced the heart. The evidence in support of this motion consisted of the affidavits of the prosecuting attorney, F. B. Blue; Charles Sinsel, Joseph H. McGraw, A. C. Love, one of the officers having charge of the jury, and Joseph Marum, one of the counsel for the defendant at the trial.

Mr. Blue deposed, that after Mr. Mason, one of the prisoner's counsel, had made the closing speech for the defence, and before the prosecuting attorney made the concluding argument for the State, the court took a recess for dinner and the judge and prisoner left the court-room, but the jury remained in their seats. The prosecuting attorney was standing near the end of the table in front of the judge's stand, with his back to the jury and about ten or twelve feet distant from it, having McDaniel's heart in his hand, explaining the wound in it to Charles Sinsel; that deponent went up to them, and they all talked about the heart. The prosecuting attorney said that the prisoner's counsel were

mistaken as to the direction of the wound; that they all talked about the time when the stabbing was done; the prosecuting attorney said it was done when Carter first thrust at him; deponent said he thought it was done while McDaniel had him down in the corner; that they were talking in rather an undertone; that they were within hearing distance of the jury; that the jury could have heard them if it had been quiet in the court room, but the crowd was going out of the court room, and there was some confusion in the room; that deponent did not think any of the jury heard their conversation. Sinsel and deponent stood facing the jury. While they were talking the deputy sheriff came up and took the jury into their room, and then Mr. Mason called deponent and he went to him on the other side of the room. Charles Sinsel, Joseph H. McGraw and the prosecuting attorney in substance deposed to the same facts, Sinsel saying they were talking an ordinary tone, and prosecuting attorney said "I had the heart in my hand, and from my position I don't think the jury could have well seen it." The conversation was in an ordinarily low tone of voice, and was directed to Blue. The crowd was, and had been passing out of the court-room at the time.

Joseph Marum deposed that he and Mr. Mason were both in the court-room at the time this conversation took place, on the opposite side of the court-room, and saw the prosecuting attorney, Sinsel and Blue standing talking some ten or twelve feet from the jury; that deponent called the attention of Mr. Mason to them, who asked the deputy sheriff to take the jury to their room, which he did. It does not appear that Mr. Marum heard any of this conversation, nor that any of the jurors were examined whether they heard any part of it, which might properly have been done, and which it seems probable would have been done, if such fact could have been proved by them, for although they would not have been competent to prove they were not influenced by what they heard, they were perfectly competent to prove whether or not they did hear, and what they heard. If the jury did not hear what was said they could not have been influenced by it to the prejudice of the prisoner. The evidence wholly fails to prove that this conversation was in fact heard by the

jury, and we cannot afford to establish a precedent whereby a prisoner .could obtain a new trial whenever and as often as some curious or officious stranger, or some indiscreet or zealous friend might choose to have an improper conversation in the presence or hearing of the jury, without it being made to appear that the same was in fact heard by the jury, or could in any manner have influenced their verdict.

We are therefore of opinion that the court did not err in overruling the defendant's motion to set aside the verdict because of the matters alleged in his second bill of exceptions.

The judgment of the circuit court of Taylor county is therefore affirmed with costs and thirty dollars damages.

AFFIRMED.