## J. W. SPEIGHTS V. THE STATE.

### No. 2082. Decided December 13, 1899.

**1. Continuance—Diligence.**

Defendant being informed that certain of his witnesses were about to remove from the State, applied for process for them in September, but said process was not issued until the following January, after said witnesses had removed from the State, and was not placed in the hands of the officer for service until February. After their removal defendant could have taken their depositions, which he did not attempt to do. Held, this shows a total lack of diligence even on a first application for continuance, whereas this was a fourth application.

**2. Same—Attached Witnesses.**

To entitle a party to a continuance for absent attached witnesses who are under bond, it must be shown that, when they were in default upon the opening of the court, defendant procured the forfeiture of their bonds and made further efforts, under the law, to secure their attendance by new process.

**3. Same—Process Executed in Another County.**

Where it appears that the absent witness was served with process in another county, but was not placed under bond for his appearance, a continuance was properly refused.

**4. Same—Expert Cumulative Evidence.**

A continuance for medical expert testimony will be held properly refused where there was not only a lack of diligence shown, but it further appeared that said testimony would be but merely cumulative of other expert testimony which was adduced by defendant at the trial.

**5. Wife-Murder by Administration of Poison—Evidence Sufficient.**

See opinion for facts stated which the court holds are amply sufficient to establish a death caused by defendant's administering strychnine poison to his wife, and to support a conviction for murder in the first degree with penalty assessed at a life term in the penitentiary.

APPEAL from the District Court of Newton. Tried below before Hon. STEPHEN P. WEST.

Appeal from a conviction for murder in the first degree; penalty, imprisonment for life in the penitentiary.

The indictment charged appellant with the murder of Sudie Speights (his wife) by mingling strychnine with water and other medicines, with the intent and well knowing that she would take and swallow the same, and that the said Sudie Speights did take and swallow the same and died from the effects thereof on the 4th day of June, 1896.

The opinion states the case.

*K. B. Seale,* for appellant.

*Rob't A. John,* Assistant Attorney-General, for the State.

HENDERSON, JUDGE.—Appellant was convicted of murder in the first degree, and his punishment assessed at confinement in the penitentiary for life, and he prosecutes this appeal.

The record presents but two questions which require consideration, —the first, the action of the court overruling appellant's motion for continuance, and refusal to grant him a new trial predicated on that

ground; and the second, that the testimony is insufficient to sustain the conviction.

This was appellant's fourth application for continuance, and was based on the absence of Drs. T. E. Stone and M. R. McAlpin, J. Sanders, Sam Smith, Mrs. Flora Smith, J. L. Maddox, Mrs. S. A. Smith, Mrs. Tera Powell, and Mrs. Maggie Nation. Dr. McAlpin and Mrs. S. A. Smith were present and testified; consequently they are eliminated. As to each of the other witnesses, we do not believe the record shows appellant used sufficient diligence. As to Mrs. Flora Smith, J. L. Maddox, and Sam Smith, appellant says that he applied for a subpœna for said witnesses at the September term, 1898, as he was informed that they intended to remove across the Sabine River into Louisiana; that said process was not issued by the clerk until the 14th of January, 1899, and after said witnesses had removed from Newton County into the State of Louisiana (they having removed about the last of December, 1898); that the process for said witnesses was not placed in the hands of the sheriff until February 15, 1899, and was not executed on said witnesses. This shows a total lack of diligence on the part of appellant. He should not only have procured an order for the issuance of said process, but he should have seen that said process was issued by the clerk, and placed in the hands of the sheriff promptly. If this had been done, said witnesses could have been served and placed under bond, as they remained in Newton County some three months after the order for process was made. And, in addition to this, the record does not negative the idea that appellant knew, when the process was issued, that said witnesses had removed to Louisiana. In fact, the failure to negative this idea suggests that appellant knew of such removal. After such removal, he had full opportunity to take the depositions of these witnesses, and no attempt was made to procure the same. This was not sufficient diligence, even on a first application. It appears that the witnesses Dr. Stone and Mrs. Tera Powell were attached by the sheriff of Jasper County on the 1st day of March, 1899, and their bonds taken and returned on the 13th of March, 1899. The court met on March 27, 1899, and this cause was not called for trial until April 6th. Said witnesses, as appears, were in default on the opening of the court, but no forfeiture of their bonds was taken, and no further effort was made to secure their attendance. As to the witness Dr. Sanders, process was issued on January 14, 1899, and the sheriff of Orange County executed same on January 19th, and, as stated, as required by law. It is not shown, however, that any bond was taken for this witness. The witness Mrs. Maggie Nation was served by the sheriff of Newton County with process on February 28th, and her bond taken. The same observation made with reference to the default of other witnesses is applicable to this witness. She was in default on the meeting of the court, and her bond should have been forfeited, and new process procured. As to the witnesses Drs. Stone and Sanders, they were desired as experts,

and it is said they would have testified that, from the symptoms as detailed by the State's witnesses, deceased did not die by strychnine poisoning. This testimony was of a cumulative character. Doubtless, by the use of diligence, other expert witnesses could have been procured. However that may be, appellant was lacking in diligence to procure these witnesses, and their testimony would have been merely cumulative to that adduced by appellant through other experts. Appellant states in his application that Dr. Stone, as he was informed, was absent on account of the illness of his wife, and that Dr. Sanders was sick; and he refers to certificates which he alleges are attached to the application for continuance, though we fail to find any such certificates. As stated before, this was the fourth application for continuance, and appellant should have been at least diligent to procure and have his evidence present at the trial, and, as stated, said testimony was of a cumulative character. It is true appellant states in his application that he could not procure said testimony from any other source, but it occurs to us as remarkable that there were only two doctors in that section of the country by whom appellant could prove that, from the symptoms given by Dr. Childers, deceased did not die of strychnine poisoning. The fact is he did procure other doctors to testify to this, and doubtless, by proper diligence, might have procured still others, even after these witnesses defaulted, on the 27th of March. The court did not err in overruling the application for continuance, nor in refusing to grant a new trial on said account.

Appellant strenuously insists that the corpus delicti was not proved; that the testimony is neither sufficient to prove that appellant administered strychnine to Sudie Speights (his deceased wife), nor that she died of strychnine poison. We have examined the record carefully in this regard, and, in our opinion, there can be no reasonable doubt that appellant administered strychnine to his wife. He is shown to have procured some strychnine in a bottle from Berry Griggs on Monday, June 1st. This was evidently a remnant of pulverized strychnine, and had been on hand for a considerable length of time. He procured this, as he stated, for the purpose of killing some dogs. Appellant is shown to have procured a prescription from Dr. Childers for his wife on Monday. This was bromide of potash, or bromidia, put up in a bottle, and its appearance was clear. On Wednesday morning following his wife went to her mother's, some quarter of a mile distant from where she and appellant lived, complaining, and stating that she had taken some medicine, and when she took it it made her awful sick. In a short while she took a dose at her mother's, and was directly seized with convulsions. This was evidently the bottle of bromidia, and strychnine had been placed therein. Dr. Childers was sent for about 1 o'clock, and when he got there she appeared to be resting easy. The doctor noticed that her mouth would draw, and her muscles were twitching, and he prescribed some more bromidia for her. Appellant

is shown to have stated to F. M. Griggs, on Tuesday, that the strychnine he got from Berry Griggs was no good, and applied to him for more, but failed to get it. On Wednesday evening; at 3 o'clock, appellant left Erwin's (where his wife was sick), and went about a mile, to Willie Teston's, and procured from him a one-eighth ounce bottle of crystallized strychnine, under a pretense that he desired to poison some dogs. He returned to Erwin's, and about 5 o'clock, his wife, being thirsty, called for water, and he brought her a dipper of water. She drank of this, complaining that it was very bitter. It was also noticed by others of the family that the contents of the dipper looked draggy. One witness describes it as if there were small particles of rice in it. After giving his wife water, he threw the remainder of the contents of the dipper on the ground. Shortly after she drank of this water she was again seized with violent convulsions, and the doctor was sent for, and again gave her bromide of potash. During the night Dr. McAlpin was called in. After he came he prescribed chloral in large doses, which was given. She had spasms at intervals during Wednesday night and Thursday morning, until some time Thursday evening, when the convulsions ceased, and she appeared to be in a stupid, exhausted condition. Purgatives were given, and her bowels moved some time Thursday night. She lingered in that stupid condition until Friday evening, when she died. From the foregoing, and other testimony in the record, there can be no reasonable doubt that appellant administered strychnine to his wife. As stated, he procured the strychnine for the purpose, as alleged by him, to kill some dogs. This was shown by the State to be absolutely false. The fact that the bottle of medicine taken by his wife to her mother's contained a sediment at the bottom, showed that some other substance had been mingled with the bromide prescribed by the doctor, and that this medicine, when taken, produced convulsions, is a strong circumstance showing that the strychnine procured by him on Monday from Griggs had been mingled with the medicine prescribed for his wife. This not proving effective, his procurement of other strychnine on Wednesday, for the ostensible purpose of killing dogs, which was shown by the State to be utterly untrue; his return to his sick wife's bedside, and his ministrations to her in a dipper of water of a bitter substance, resembling strychnine; her almost immediate seizure with convulsions; this, also, in connection with the fact that the first bottle of medicine which his wife brought there and was taking mysteriously disappeared from the room,—all combine to establish the proposition that appellant procured the strychnine, not for the purpose of poisoning dogs, as alleged, but for the purpose of administering to his wife, and that he administered the same to her with his own hands.

The remaining question is, did the strychnine so administered cause the death of his wife? It will be noted in this connection that an autopsy, or a pretended autopsy, was made,—that is, the body of deceased was disemboweled, and the contents of her stomach and

liver examined superficially, no chemical analysis being resorted to, —and the doctors state that they saw no indications of strychnine. They do state, however, that a portion of the stomach appeared to be irritated. Of course, if there had been a thorough autopsy of the contents of the stomach, and the chemical tests applied to determine the presence of strychnine, and none had been found, this would settle the case against the State. The fact, however, that the examination was of a most casual kind, and merely ocular, signifies nothing, in the face of the fact that appellant, as above shown, administered strychnine to deceased. Nor do the experts introduced by appellant, who testified that, from the symptoms as testified by Dr. Childers, in their opinion deceased did not die of strychnine poison, serve to raise a reasonable doubt in the case, inasmuch as the State introduced an equal number of experts, who testified that the symptoms did indicate unmistakably strychnine poisoning. It will be noted that appellant's experts, with singular unanimity, agree that from Dr. Childers's statement, as well as that of Dr. McAlpin, deceased suffered from symptoms which invariably attend strychnine poisoning, to wit: That deceased suffered from convulsions, twitching of the muscles; she was thirsty, and in the intervals drank water; that her face was contorted; and other symptoms not necessary to be mentioned. But some of these symptoms they say would be present in hysteria, and one or two testified that some of the symptoms would attend uræmic poisoning, but they admit all the symptoms more nearly apply to strychnine poisoning. However, they base their opinion on the length of time after the administration of the strychnine before the death of deceased. They testify that death usually ensues in a very short time,—generally two hours, and rarely more than seven hours. They do not, however, seem to consider in their testimony the fact that antidotes were applied to counteract the effect of the poison, and that this would have the effect of prolonging the struggle between life and death. The testimony shows, in an unquestioned way, that bromide of potash is an antidote; that strychnine is insoluble in a solution of bromidia. We gather from the testimony that the first strychnine was given in absolute connection with the antidote bromide of potash; that large doses of this drug were subsequently administered to deceased, which evidently counteracted the effect of the quantum of strychnine which she had taken from the first bottle procured by appellant. When he dosed her from the second bottle of crystallized strychnine on Wednesday evening, and she was again thrown into convulsions, chloral, one of the most powerful antidotes, was administered to her in a short time in large doses; and this, according to the testimony of the State's experts, would serve to prolong life. While the experts appear to agree that the prolongation of the life of deceased was phenomenal, yet it occurs to us that they overlook the fact that powerful remedies were used, and that these would serve to prolong life. All persons who take strychnine do not die, and the indications are that deceased

might have recovered, with the remedies used, from the first ministration of strychnine, as she was resting easy that evening when the doctor left her, or she might have ultimately died of exhaustion. The ministrations from the second bottle of strychnine on Wednesday evening renewed the convulsions, and, notwithstanding the heroic doses of chloral which were given her, the convulsions continued until some time Thursday evening, when they ceased, and from that time on she remained in a stupor. How many convulsions she had we are not informed. Evidently not less than five or six, and possibly as many as ten. That she died from exhaustion is entirely consistent with the authorities on this subject, and that she lingered as long as she did is not unreasonable, and is not without support in the books. We quote from Mann on Forensic Medicine and Toxicology (pages 544, 545), as follows: "In fatal cases of strychnine poisoning, death usually occurs within two or three hours, the patient being in his customary health previous to the commencement of the attack. Tetanus is never so rapidly fatal. For several hours soreness and stiffness of the muscles of the face and neck precede the tetanus convulsions, and death rarely occurs within twenty-four hours, being usually delayed for several days." "A striking instance of the value of chloral hydrate as an antagonist to strychnine is afforded by a case related by Jones. A man swallowed two three-penny packets of Battle's Vermin Killer, which produced typical symptoms of strychnine poisoning. The patient did not vomit, nor was the stomach emptied. Twenty grains of chloral hydrate dissolved in water were injected subcutaneously, followed by a second dose of twenty grains, and subsequently by ten grains more. Twenty grains were also given by the mouth as soon as the patient could swallow. Recovery took place." And see 4 Witthaus & B. Forensic Medicine and Toxicology, p. 796. In our opinion, the evidence amply supports the finding of the jury that the death in this instance was brought about by strychnine poisoning. So far as the motive of appellant is concerned, it is not necessary to discuss that; we think the record bears unmistakable evidence of his motive to get rid of his wife. There are no errors in the record, and the judgment is affirmed.

*Affirmed.*

Davidson, Presiding Judge, absent.