# REPORTS OF CASES

### DETERMINED IN

# THE SUPREME COURT

#### OF THE

# STATE OF UTAH.

*(Continued from Volume 37.)*

## STATE v. VANCE.

### No. 2039. Decided July 13, 1910 (110 Pac. 434).

1. INDICTMENT AND INFORMATION— ELECTION BETWEEN CHARGES— MEANS OR CAUSE OF DEATH. The count of an indictment averring that on a certain day defendant beat, kicked, and bruised deceased, and the next day administered poison to her, and that, by means of all this, she became mortally sick, and of the mortal sickness thereby occasioned she died, charges but one means or cause of death, the combined effect of the two transactions, so that no election by the state can be required on the theory of its being alleged that the death was caused by different means. (Page 17.)

2. HOMICIDE—INDICTMENT—VARIANCE—MEANS OR CAUSES OF DEATH. Where an indictment charges death to have been caused by co-operating causes, there can be no conviction on evidence that it was caused by one of them singly. (Page 18.)

3. CRIMINAL LAW—EXPERT TESTIMONY—EFFECT—MEANS OR CAUSE OF DEATH. While ordinarily a jury after considering and weighing purely opinion evidence contrary to their own knowledge and experience may disregard it entirely, they may not do so where witnesses, though testifying as experts, testify to symptoms and conditions actually seen and observed by them; and where experts describe to the jury the conditions as they have observed them on an autopsy, and the effects attributable to

such conditions, and state that there were no internal evidences of injury from the beating of deceased, and that she did not die from either the beating alone or from the shock therefrom, but from the combined effect of these and poison, and such evidence stands unimpeached, it may not be ignored, and the jury authorized to find that death resulted from the beating alone. . (Page 22.)

4. HOMICIDE—EVIDENCE—DYING DECLARATIONS. Dying declarations may be either in writing or oral, and where there are both, if otherwise competent, either or both may be given in evidence. (Page 24.)

5. CRIMINAL LAW—EVIDENCE—RES GESTAE. Deceased on arising from the kitchen floor where defendant had knocked her went onto the porch, and, calling to a neighbor, said that defendant was killing her. Then as defendant was in the act of closing the kitchen door she returned, when he again seized her, threw her on the floor, and kicked her. *Held*, that the statement to the neighbor was part of the *res gestae*. (Page 24.)

6. CRIMINAL LAW—EVIDENCE—DECLARATION OF DECEASED IN DEFENDANT'S PRESENCE. Statement of deceased, though made when she was out of, and defendant in, the house, having been made when he must have heard it, was made in his presence as regards its admissibility. (Page 25.)

7. CRIMINAL LAW—EVIDENCE—TESTIMONY TAKEN AT PRELIMINARY HEARING. That witness was a nonresident of and absent from the state at the time of the trial is sufficient, under Comp. Laws 1907, section 4513, subd. 4, to authorize his testimony, taken at the preliminary hearing in the presence of defendant and with opportunity to him to cross-examine, to be given at the trial.[1] (Page 26.)

8. CRIMINAL LAW—RECEPTION OF EVIDENCE—RIGHT TO BE CONFRONTED WITH WITNESSES. The constitutional rights of defendant to be confronted by the witnesses against him are not violated by Comp. Laws 1907, section 4513, subd. 4, authorizing testimony taken at the preliminary hearing, in the presence of defendant and with opportunity to him to cross-examine, to be given at the trial; witness being then a nonresident of and absent from the state.[2] (Page 26.)

9. CRIMINAL LAW—TRIAL—AMENDING STENOGRAPHER'S CERTIFICATE—TESTIMONY AT PRELIMINARY HEARING. If the provision of Comp. Laws 1907, section 4670, that the stenographer taking in shorthand the testimony at the preliminary hearing in a homicide case shall transcribe his notes in long-hand, and certify that the transcript contains "a correct statement of testimony and proceedings in the case," is not technically satisfied by a

---

[1] State v. King, 24 Utah, 482, 68 Pac. 418, 91 Am. St. Rep. 808.
[2] State v. King, *supra*.

certificate "that the above and foregoing is a full, true, and correct transcript of all the proceedings therein," the defect is formal, and may be amended at the trial. (Page 27.)

10. CRIMINAL LAW—TESTIMONY AT PRELIMINARY HEARING—FILING ORIGINAL NOTES—STATUTES. The provision of Comp. Laws 1907, section 4670, that, if at the preliminary hearing in a homicide case accused is held for trial, the stenographer shall, "within ten days after the close of such examination, transcribe his said shorthand notes into longhand, and certify and file the same with the clerk of the district court . . . and shall in all cases file his original notes with said clerk," even if implying that the original notes must be filed within said ten days, is merely directory as to the time limit for all purposes; so that, in the absence of claim of prejudice to defendant from the original notes not being filed in such time, it was not error to allow the filing thereof at the trial, and to admit in evidence the transcript of the testimony of an absent witness taken at the preliminary hearing. (Page 28.) .

11. WITNESSES—CROSS-EXAMINATION OF ACCUSED—SCOPE. Under Comp. Laws 1907, section 5012, declaring the rules of evidence in civil cases applicable in criminal cases, except where otherwise provided, and section 5015 providing that, if a defendant offers himself as a witness, he may be cross-examined by counsel for the state the same as any other witness, the propriety of a question on cross-examination of one accused of crime depends on whether it would be proper if asked of any other witness. (Page 32.)

12. WITNESSES—CROSS-EXAMINATION OF ACCUSED—SCOPE. As to whether accused has made certain admissions or has made statements of material facts against himself, and everything which may contradict, modify, explain, or make clearer, limit, or enlarge the meaning of the statement made by him while testifying, may be inquired into on cross-examination; but the inquiry must be limited to the subject-matters gone into by him in his testimony in chief. (Page 32.)

13. WITNESSES—CROSS-EXAMINATION OF ACCUSED—SCOPE. Though, where accused as a witness denies that he committed or was connected with the commission of the criminal act or acts constituting the offense for which he is being tried, his cross-examination may ordinarily extend to the whole range of facts which in some way are related to the offense, yet where he limits his statements to negativing or explaining mere isolated facts, or merely states what occurred at a particular time and place, then what occurred at such time and place ordinarily constitutes the subject-matter on which he testified, so that his cross-examination should be limited thereto. (Page 32.)

14. WITNESSES—CROSS-EXAMINATION OF ACCUSED—SCOPE. Defendant in a criminal case in his testimony in chief having neither directly or indirectly denied, nor in any way negatived, his connection with the beating of deceased, but left the subject untouched, requiring him on cross-examination to answer questions relating to conversations and statements respecting the beating, and deceased's condition attributable thereto, and which were not proper as affecting his credibility or the weight that should be given to his testimony, was error.[3] (Page 33.)

15. WITNESSES—PRIVILEGE—WAIVER—CROSS-EXAMINATION OF ACCUSED. Defendant in a criminal case, when taking the stand as a witness, does not waive his rights with regard to testifying against himself, which in legal effect he is required to do where his cross-examination is carried beyond its legitimate scope. (Page 34.)

APPEAL from District Court, Third District.—*Hon. Geo. G. Armstrong*, Judge.

Thomas Vance appeals from a conviction of murder.

REVERSED, and new trial granted.

*W. L. Maginnis, A. S. Maginnis* and *Jno. F. Tobin* for appellant.

*A. R. Barnes*, Attorney-General, for the State.

APPELLANT'S POINTS.

Where an indictment charges death to have been caused by two causes there can be no conviction on evidence that it was caused by one of them singly. (*State v. Smith*, 67 Me. 386; *State v. Lincoln*, 49 N. H. 464, 470-71; *Mills v. State*, 52 Ind. 187, 192; *State v. Palmer*, 35 Me. 9; *State v. Burgess*, 40 Me. 592; *Burgess v. State* [Miss.], 33 So. 499; *Hill v. State*, 72 Miss. 527, 17 So. 375; 1 Bishop Criminal Proced., sec. 426; 1 Wharton Crim. Law, 423; Wharton Crim. P. & P., sec. 293; *State v. Spencer*, 15 Utah 149; *People v. Sweeny*, 55 Mich. 586-589.)

---

[3] State v. Shockley, 29 Utah, 25, 80 Pac. 865, 110 Am. St. Rep. 639; State v. Williams, 103 Pac. 250.

An indictment charging several criminal acts, all, however, as a part of the same transaction, and as constituting one crime, charges but one offense. (*People v. Hill,* 3 Utah 334, 3 Pac. 75; *Hawker v. The People,* 75 N. Y. 487; *State v. Porter,* 26 Mo. 201; *State v. Lincoln,* 49 N. H. 464, at 470-71.)

The rule of law is, and we understand it applies equally to criminal and civil cases to the defendant or any other witnesses that a witness must only be cross-examined upon the matters brought out in his direct examination. (*People v. Smith* [Cal.], 99 Pac. 111; *Summer v. Blair,* 9 Kan. 521; *Da Lee v. Blackburn,* 11 Kan. 190; *Phillips v. Elwell,* 14 O. S. 240; *Haynes v. Ledyard,* 33 Mich. 319; *State v. Testerman,* 68 Mo. 411; *People v. McGungill,* 41 Cal. 430; *People v. O'Brien,* 96 Cal. 171, 180, 31 Pac. 45; *People v. Arrighini,* 122 Cal. 121, 54 Pac. 591; *People v. Gallagher,* 100 Cal. 466, 475, 476, 35 Pac. 80.)

If the dying statement in writing was admissible the oral statements were not admissible. Where the statement is committed to writing, it is essential to produce the writing which is the best evidence. (Vol. 1, Greenleaf's Ev., sec. 161; *Trowter's case,* 1 E. P. C. 356; *People v. Tracy,* 1 Utah 343, 346; *Collier v. State,* 20 Arl. 36; *Rex v. Gay,* 7 C. & P. 230; *Rex v. Reason,* 1 Strange 499; *Boulden v. State,* 15 So. 341; 3 Russell on Crimes (Internat. Ed.), page 394; 1 Wharton Criminal Law, sec. 679.)

RESPONDENT'S POINTS.

It is the contention of the state that there is but one offense charged in the third count, that is, murder, which is charged to have been committed by two different means, or rather by the combination of two different means.

Such pleading is permitted by express provision. (Sec. 4734, C. L. Utah 1907; Sec. 4161, C. L. Utah 1907; see, also, *King v. State* [Ala.], 34 So. 683; 2 Hawking's Pleas of the Crown, p. 251; Wharton on Homicide [3rd Ed.], sec. 563, p. 848; Bishop's Directions and Forms [2nd Ed.], secs. 20 and 535; Bishop's New Criminal Procedure, vol. 1, secs.

453 and 434; Wharton's Criminal Pl. and Pr. [9th Ed.],
sec. 253; Kerr on Homicide, sec. 245; *Anderson v. U. S.,*
170 U. S. 481; *St. Clair v. U. S.,* 154 U. S. 134; *State v.
Edmondson,* 3 Tex. 162; *State v. Feister* [Ore.], 50 Pac.
561; *People v. Davis,* 56 N. Y. 95; *Jackson v. State,* 39
Oh. St. 37.)

Where an offense charged may be committed by two differ-
ent means, not only may its commission by both means be
charged in one count, but proof of the offense committed
by either means will sustain the allegation. (*State v. Hewes*
[Kan.], 57 Pac. 959; *State v. O'Neil,* 51 Kan. 651; Bishop's
New Crim. Pro., vol. 1, sec. 453, sub-division 2; *Com. v.
Stafford,* 12 Cushing 619; *Com. v. Macloon,* 101 Mass. 1.)

The evidence for the prosecution should not be held in-
sufficient solely because it is disconnected, weak and incon-
sistent, if taken together it may satisfy the jury beyond a
reasonable doubt. (12 Cyc., page 490, subdivision 2; *Howard
v. State,* 108 Ala. 571, 18 So. 813; Cyc., vol. 12, page 492,
subdivision 5; *Kossakowski v. People,* 177 Ill. 563, 53 N. E.
115; *Williams v. People,* 166 Ill. 132, 46 N. E. 749; *Davis
v. People,* 114 Ill. 86, 29 N. E. 192; *Com. v. Salyards,* 158
Pa. St. 501, 27 Atl. 993; Elliott on Evidence, vol. 4, secs.
2710-2713.)

If there were a series of circumstances leading to the con-
clusion of guilt, a verdict of guilty might satisfactorily be
pronounced. (Wills Cir. Evidence, p. 235; Trials for Mur-
der by Poisoning, pp. 42-43; *Com. v. Danz,* 211 Pac. 507,
60 Atl. 1070; Reese's Med. Juris. & Toxicology, 443;
*Zoldoski v. State* [Wis.], 52 N. W. 778.)

The testimony was sufficient to justify such verdict. Such
being the case, this court will not disturb the verdict. (*State
v. McCune,* 16 Utah 174; *State v. Halford,* 17 Utah 482;
*State v. Webb,* 18 Utah 444; *State v. Endsley,* 19 Utah 478.)

A witness may state the substance of a dying statement.
Identical words need not be given. (Wharton on Homicide
[3rd Ed.], p. 1022; *State v. Carrington,* 15 Utah, 480; 21
Cyc. 981; Wharton on Homicide [3rd Ed.], 1019; *State v.
Schmidts,* 73 Ia. 469, 35 U. S. 590.)

The defendant having taken the stand in his own behalf, thereby subjected himself to cross-examination upon the same terms as any other witness. (Section 5015, Compiled Laws of Utah 1907.) The limits of such a cross-examination are within the sound discretion of the trial court. (*People v. Hite*, 8 Utah 461; *People v. Larsen*, 10 Utah 143; *State v. Shockley*, 29 Utah 48; *State v. Wells*, 54 Kan. 151.)

FRICK, J.

Appellant was convicted of the crime of murder in the first degree, and sentenced to suffer death.

The information contains three counts. In the first count it is, in substance, alleged that on the 26th day of November, 1907, the appellant committed the crime of murder in the first degree by assaulting one Mary Vance with the specific intent to take her life, and, with that intent and purpose, willfully, unlawfully, feloniously, deliberately, premeditatedly, and of his malice aforethought, with his fists, hands, and feet did strike, kick, beat, and bruise the said Mary Vance, and did then and there, and thereby, inflict upon the body of the said Mary Vance a mortal contusion, bruise, and wound, from which the said Mary Vance languished until the 8th day of December, 1907, when she died from the contusion, bruise, and wound aforesaid. The acts of appellant and the means used by him to produce the death of the said Mary Vance are alleged with much particularity, and the count contains a complete charge of murder in the first degree, and states a complete transaction. In the second count appellant is charged with having committed the crime of murder on the 27th day of November, 1907, by administering poison to one Mary Vance with the specific intent to take her life, and that said Mary Vance took said poison, and that by reason thereof she became mortally sick and languished until the 8th day of December, 1907, when she died from the effects of the poison so taken as aforesaid. In this count all the essential ingredients constituting murder in the first degree by administering poison as a means of death are alleged, and it is further alleged that appellant

committed the crime by the means of said poison. In the third count all the allegations of the first count are set forth at length with the exception that it is not stated that the beating, bruising, and kicking resulted in death. In this count are also set forth in full all the allegations contained in the second count, excepting the statement that death was caused by the poisoning. After repeating the statements contained in the first and second counts as aforesaid, the cause of death is stated in the third count as follows: "That by means whereof, to wit, the striking, kicking, beating, and bruising of the said Mary Vance . . . and the drinking of the water and poison as aforesaid, the said Mary Vance became mortally sick and distempered in her body, and the said Mary Vance of the beating, kicking, and bruising aforesaid and of the poison aforesaid so by her taken, drank, and swallowed as aforesaid, and of the mortal sickness and distemper occasioned thereby," she languished from the 27th day of November, 1907, until the 8th day of December, 1907, when she "of the said mortal sickness occasioned by the said beating, kicking, bruising, and poison aforesaid died; and so the said Thomas Vance, the said Mary Vance, in the manner and form aforesaid, willfully, unlawfully, deliberately, premeditatedly, feloniously, and of his malice aforethought did kill and murder." After the state rested the appellant requested the court to require the state to elect on which count of the information the state would ask a conviction. To this request the district attorney replied: "The state will elect to stand upon the count of the information which charges that death resulted from beating and poisoning, which, I understand, is the third count in the information." The state having elected to stand on the third count, appellant interposed a further motion by which he requested the court to require the state to further elect on which charge in the third count, namely, the beating and bruising, or the administering of poison, the state would ask to go to the jury. This motion was opposed by the state and was overruled by the court, to which ruling the appellant duly excepted and assigns the ruling as error. In view that prac-

tically the same question arises upon another assignment relative to the giving of a certain instruction, which, in turn, involves some of the facts, we will first state what we deem to be the salient facts in the case.

The undisputed facts, as deduced from the state's evidence, relative to the beating, kicking, and bruising are substantially as follows: Appellant and the deceased on the 26th day of November, 1907, and for more than twelve years prior thereto, sustained the relation of husband and wife. They lived together in Salt Lake City, with their children, four in number, ranging in age from two to twelve years. Appellant was apparently a poor man, and his wife and family were dependent upon his daily labor for support. Appellant was at work on the 26th day of November, 1907, and a little after the noon hour of that day came home for his midday meal. After all the family, including the deceased, had taken their places at the table and had been eating, appellant requested the deceased to refill his cup with coffee. The deceased proceeded to pour the coffee into appellant's cup, and in doing so poured more coffee into the cup than he desired, whereupon he said: "Didn't I tell you not to pour my cup so full of coffee?" To this deceased answered that she did not hear appellant's request. After some heated words, appellant picked up the cup of coffee and threw the coffee in the face of the deceased, and threw the cup against the wall and broke it. Appellant then picked up a chair, but the deceased admonished him not to strike her with it. He put down the chair, and said: "God damn you, I'll kill you." He then approached the deceased, and with his clenched fist struck her on or near the shoulder and knocked her down, and she fell against the kitchen stove, which was in the same room in which the family were then eating dinner. The deceased fell against the "middle part" of the stove with her left side. When this occurred, the children, or some of them, screamed, and the deceased got up from the kitchen floor and went through the door which led from the kitchen to the rear porch, and from there called to a neighbor, a Mrs. Wunderlich, who testified as follows: "She (the deceased)

said: 'Mrs. Wunderlich, go telephone for the police. He is killing me.' I said: 'Who?' She said: "Tom Vance, the brute which I call my husband.' Then she went into the house again." Mrs. Wunderlich was standing in her own back yard, which was adjoining the back yard and porch on which the deceased stood while she was talking to Mrs. Wunderlich as above stated. Mrs. Wunderlich says that the deceased was but a short distance from the door leading from her kitchen to the rear porch, and that, while the foregoing statements were made by the deceased, she was about ten feet or such a matter from Mrs. Wunderlich. When the deceased returned to the kitchen, appellant resumed the attack upon her, and seized her with his hands "striking her and throwing her down on the floor." After deceased fell, appellant kicked her, and she exclaimed, "Tom! you have killed me." When appellant kicked her, she was lying on the kitchen floor with her back towards him, and the eldest daughter, who was present and saw and heard all that occurred, says that appellant "kicked her (deceased) on the thigh." Within a few seconds after the kicking occurred, the deceased arose from the floor, sat down on a chair by the table at which appellant had resumed his seat just preceding her. Appellant finished his meal, and "had a smoke," and in a short time left the house to go to his work. After appellant left the house, the eldest daughter, in describing the deceased's condition, said: "She looked kind of pale. She was trembling." About one hour and a half after the beating and kicking, the same daughter says the deceased "got herself and the baby ready and went to town." The "baby" was about two years old, and the deceased carried him about two blocks to the street car line. At about five o'clock in the evening the deceased returned from town, and helped some in preparing the evening meal, but did not herself eat anything. After supper appellant in hearing the children rehearse some of their lessons found fault with the eldest daughter because she did not have her lesson, when the deceased spoke to him, and said, "I have had Lena helping me to-day. If you want to quarrel with anybody you can quarrel with me." This

is all that passed between the deceased and appellant that evening. Appellant and the deceased usually slept together in the front room, but on the night in question he slept in the front room with some of the children, while she, with the other children, slept in what is designated as the "middle room." The house, it seems, was divided into three rooms. The one next to the street was designated the front room, the next one the middle room, and the one to the rear where the trouble arose was the kitchen and dining room. Deceased got up first the next morning and prepared breakfast for the family, including appellant, after which he left to go to his work. Nothing passed between them that morning. The deceased did not seem well this morning, and, after making some preparation for dinner, but before the dinner hour had arrived, she lay down on the bed in the middle room. Before lying down she filled an ordinary drinking glass or tumbler nearly full of water, which she took from the water bucket. The water had been taken from a flowing well in a neighbor's yard, where the family obtained its water supply for domestic use. She set the tumbler with the water on the end of a sewing machine, which was just inside and near the door leading from the kitchen into the middle room at the head of the bed. That is, the machine was about three feet long and was standing between the door and the head of the bed on which the deceased was lying. Just before and about the time the deceased lay down on the bed, she looked pale, and, as the witness expressed it, was "trembling." It seems that some time after the deceased went into the middle room to lie down on the bed Mrs. Wunderlich and Mrs. Amanda Vance Ward, a sister of the deceased, called upon her, and during that time, at the request of the deceased, made an examination of her body, and discovered a bruise four or five inches long and nearly as wide as the witness' hand on the right side of the vagina. The color of the bruised portion, the witness said, was "as black as it could get." There were no other bruises or marks discovered on deceased's body at that time. The two women left deceased's home some time before the noon hour. A little after twelve o'clock noon,

appellant came home to dinner. The eldest daughter, who, apart from the younger children, was the only person who saw what occurred, in referring to what appellant did, says: "He came home, washed his hands, and was talking to Albert and playing with him. Then he asked Florence where mama was. She said: 'She is in there on the bed lying down.' He walked up to the door and put his hand on the door casing and looked in. Then turned around and came away." Following this testimony the record shows the following questions and answers: "Q. Well, now, just describe his position when he had his hand on the door casing. You could see his hand all the time, could you? A. Yes, sir. Q. Could you see the rest of his body? A. I could see his side. Q. Do you know whether or not he was in that room during any other time that noon? A. No, sir. I don't think he was. I don't think he was in there at all." After this appellant ate his dinner, and in about twenty minutes thereafter left to go to his work again. We remark here that the doctor who attended the deceased during her last illness from the 27th day of November until the 8th day of December, 1907, in making an examination of her body on the evening of the 27th of November, and again some time thereafter, found external evidences of physical injury which he says was in the "crotch" at the place before mentioned, and that he at no time discovered any other bruises or marks of any consequence on her body. One other witness says that deceased was bruised on the abdomen, but the bruised part is not located. The doctor who made the autopsy testified that he found two bruises on deceased's body. One he locates and describes as the other witnesses did, and the other he says was on the lower part of the abdomen on a direct line from the hip to the pubis, and was about one and one-half inches long by about three-fourths of an inch wide. No other bruises or marks were discovered on the body of the deceased. Both her attending physician and the county physician who made the autopsy agreed that there were no internal evidences of injury that was caused by or arose from the external bruises referred to, and that the deceased did not die from the shock

which in all probability resulted from the beating and kicking inflicted by appellant upon the body of the deceased. Both physicians, in substance, testified that death was not caused from either the bruises alone or the shock alone, but was caused by a co-operation or combination of the beating, kicking, and bruising and the effect of the poison.

The evidence on the part of the state with regard to the poisoning is, in substance: That appellant about a year prior to the occurrences above narrated had received some injury to his hand. That at that time, upon a prescription, he obtained from a firm of druggists in Ogden, where he and his family then lived, certain tablets which were to be used on his injured hand by being dissolved in water and the hand washed with the solution as an antiseptic. That each tablet contained about 7.3 grains of bichloride of mercury, commonly called "corrosive sublimate," which is an intense poison. That these tablets were kept in the front room where appellant slept the night after he had quarreled with and beaten the deceased as we have narrated. That both the deceased and the appellant knew that the tablets were in the trunk and they seemed to realize that they contained an intense poison, and the deceased had at some time prior to the occurrence suggested that appellant burn or destroy the tablets, but he refused to do so, claiming that he might want them for some injury such as he had had before. This was the situation when the appellant went to the door of the room where the deceased was lying on the bed at noon of the 27th day of November, the day after the beating. In her dying declaration deceased stated that she was lying on the bed with her eyes closed during the dinner hour of the 27th; that on opening her eyes she saw the appellant leave her bed and go out of the middle room door; that some time after appellant had left the house to go to his work she drank some of the water out of the glass or tumbler we have mentioned and that immediately, or at least within a comparatively short time after drinking the water, she experienced great pain in her stomach and bowels and commenced vomiting. Deceased became alarmed and sent for her neighbor, Mrs. Wunderlich,

and also for Mrs. Amanda Vance Ward, the sister to whom we have already referred. Mrs. Wunderlich arrived at the home of the deceased about two or half past two o'clock that afternoon, and she says that when she arrived the deceased was suffering and "screaming with pain," and that she was vomiting and purging from the bowels almost constantly. Mrs. Wunderlich says that she discovered a tumbler or glass about one-third or one-fourth full of water standing on the sewing machine near the head of the bed on which deceased was lying; that the witness saw nothing in the glass but water, which, as she said, contained "bubbles." On cross-examination she explained this by stating that the water seemed stale. She emptied the water out doors in the back yard. We remark that the testimony of the state chemist and the physicians was to the effect that the tablets of mercury if dropped into the water whole would require all the way from 15 minutes to an hour or more to dissolve; that the tablets in question could, however, be crushed between the thumb and finger, and, if so crushed before depositing in the water, would dissolve in about five minutes, more or less; that there would be no sediment of any consequence, but that there would be a sharp metallic taste to the water.

Dr. Kerr, who subsequently attended the deceased, was telephoned for by Mrs. Wunderlich after she arrived at the bedside of the deceased, but the doctor for some reason did not see her until about seven o'clock on the evening of the 27th. We shall not refer to the evidence of the doctors with respect to the symptoms of the deceased, but shall content ourselves with the statement that the symptoms described by all the witnesses who saw the deceased on the afternoon and evening of the 27th day of November and thereafter are conceded by the doctors who testified on the part of the state to describe the symptoms of mercurial poisoning. The doctors further testified that the autopsy disclosed that the deceased had received into her stomach some corrosive poison; that, while the symptoms might have been produced in part at least by some corrosive poison other than bichloride of mercury, yet, when all the symptoms exhibited by the de-

ceased are taken together with the evidences that were discovered at the autopsy in a portion of the stomach and in the intestinal canal of the deceased, that the controlling and predominant symptoms all pointed to the fact that the effects discovered were produced by mercurial poison. In this connection it is but just to state that the evidence disclosed that bichloride of mercury has a sharp metallic taste of which the deceased did not speak in her dying declaration, or at any other time. Moreover, another witness, Mrs. Wunderlich, said that during the afternoon of the 27th, while the deceased was vomiting, the witness discovered the odor of the oil of savin, which is classed among the corrosive poisons, and, among other things, is used to produce an abortion or mis-. carriage. No other witness, however, detected such an odor, and, as the oil is quite volatile and for other reasons that it is not necessary to state, the jury were authorized in concluding that the witness, Mrs. Wunderlich, was mistaken. It was also the theory of the defense that the deceased attempted self-destruction. The theory is based upon the claim that the deceased and the appellant did not live happily together; that she was averse to bearing more children both on account that they were poor and because she was at times at least not well. There was also some evidence, elicited on cross-examination of the eldest daughter and from others of the state's witnesses, that deceased at times was despondent; that on some such occasions she had said that she were better dead, or that she wished she were dead; or that she would rather die than have more children. There was no evidence whatever that the deceased was pregnant or that she had any of the poisons above referred to at hand except the tablets we have referred to, but there was evidence that on the day of the beating she was menstruating and the autopsy disclosed nothing to indicate that the deceased had recently been pregnant. Moreover, the doctors testified that the ovaries of the deceased were normal.

When the doctors who testified for the state were asked to state the cause of death, they stated that death was caused by two causes co-operating together, namely, the effects of the

beating, kicking, and bruising and of the corrosive poisoning. The doctors deduced this result from the following facts, namely, that a fatal dose of bichloride of mercury is all the way from less than one to three grains, and that death would ordinarily result from a fatal dose in from several hours to several days after the poison was taken into the system; that under the circumstances it was impossible to say how much in quantity the deceased took into her system by drinking the water from the tumbler, and, even if she had swallowed one-half or more of the seven grains contained in one of the tablets, it would be impossible to state how much she ejected by the violent and continued vomiting; that what can be said is, that an uncertain quantity of mercurial poison was taken internally by the deceased as was shown by both the symptoms before death and by the autopsy after death; that there were no internal evidences that the beating and bruising was sufficient to produce death by itself, but that the beating and bruising produced shock which lowered the vitality and diminished the resisting power of the deceased, and thus made the deceased's system more vulnerable to the effects of the poison, and in that way it is quite natural that the deceased should languish from the 27th day of November to the 8th day of December, and then succumb to the combined or co-operating effects of the beating and bruising, and the poison. It was also made to appear that the state chemist, Mr. Harms, made a most thorough analysis of those parts of the internal organs which were submitted to him by the physicians who conducted the autopsy. He, however, discovered no mercurial or other corrosive poison. The absence of all such poison is however readily accounted for both by the state chemist and the physicians, and the mere fact that such poison was not discovered in the internal organs of the deceased after death was by the physicians not deemed of great, much less of controlling, influence.

The second motion to elect was based upon the claim that the third count, like the two preceding ones, referred to and covered two separate and distinct transactions, and hence the state should be required to elect upon which one it would

ask a conviction. The court denied the motion, and in our opinion the ruling was right, although, as appears from one of the court's instructions to the jury, the ruling was based upon an erroneous theory. The ruling of the court can be sustained only upon the theory that, although the third count referred to two separate and distinct transactions, yet, since it was alleged that it was the combined effect arising out of the two transactions that in co-operating together constituted the means or the cause of death, the third count in legal effect stated but one transaction which consisted in stating the effect produced by the two co-operating causes. It will be observed that in the first count the beating and bruising was charged as an independent means of death. This was followed by a second count which gave the means used by appellant in committing the murder by the administering of poison, and the poison was alleged as a distinct and separate means of death. In these two counts it was not alleged, and was not intended to be, that the appellant caused the death of the deceased by the means of beating and bruising and by the administering of poison, as the pleader might well have done, but the charges in the two counts described two independent transactions, one of which occurred one day and the other upon another day, but each of which constituted a complete statement of the crime of murder, and as having been committed by separate and distinct means on different days. After the pleader had thus charged that the murder had been committed in two ways in the two counts, he added a third count in which he simply repeated the charges contained in the two counts in so far as the charges alleged the means used to produce death, and the third count was completed by charging that the death of the deceased was caused by the mortal sickness which was produced by two co-operating means or causes, namely, the beating and bruising which was inflicted upon, and the poison which was administered to, the deceased by appellant. Two co-operating causes were thus stated as the means used by the appellant to accomplish his purpose. The statement, in the

form it was thus presented, was not the statement of the use of several or various means, but it was a statement that appellant resorted to but one mode or means to accomplish the death of the deceased, namely, by the effect of two co-operating causes which in combination, and not singly, produced or caused death. The pleader, having thus fairly and clearly stated that two co-operating causes when acting in combination produced death, could not, in fairness, under the rules of pleading, claim that his allegations, single and restrictive as they were, authorized a conviction for only one of the causes, but, under the restricted form of his allegations, he was required to prove that the two causes cooperated, and that death resulted from their combined effect. If the pleader had desired to rely upon the two causes separately as well as upon their combined effect, he easily could have done so by stating in one count that the means used by the appellant to kill were beating, kicking, bruising, and by administering poison, and by any other means which the pleader thought the evidence might show were used. The pleader could have gone further and stated that the deceased was killed by means unknown, and thus have proved any means upon the trial. Moreover, under our statute (section 4734, Comp. Laws 1907), the means could have been stated in the alternative in the same count. Again, the means could have been stated as continuous; that is, that whatever means were used were applied and continued for a shorter or longer period of time, and that death was ultimately caused by the means so described. Where this form of pleading is used, the prosecutor need not establish anything more than that death resulted from any one or more of the means alleged, or that it was produced by a combination of two or more of the means described. This rule has so often been passed upon and enforced by the courts that it has become established beyond dispute. Among numerous other cases that might be cited we refer to the following well-considered cases: *King v. State,* 137 Ala. 47, 34 South. 683; *State v. McDonald,* 67 Mo. 17; *Howard v. State,* 34 Ark. 436; *Smith v. Commonwealth,* 21 Grat. (Va.) 811; *Anderson v. United*

*States,* 170 U. S. 492-500, 18 Sup. Ct. 689, 42 L. Ed. 1116;
*Joy v. State,* 14 Ind. 143; *Merrick v. State,* 63 Ind. 327;
*State v. Edmundson,* 43 Tex. 163; *Commonwealth v. Macloon,*
101 Mass. 23, 100 Am. Dec. 89; *State v. Fiester,* 32 Or. 254,
50 Pac. 561; *People v. Davis,* 56 N. Y. 95; *Jackson v. State,*
39 Ohio St. 37; *State v. Hewes,* 60 Kan. 765, 57 Pac. 959;
*Commonwealth v. Stafford* (Mass.), 12 Cush. 619; *Gonzales
v. State,* 5 Tex. App. 584; *State v. Smith,* 24 W. Va. 820-821.
See, also, Wharton on Homicide (3d Ed.), section 563; Bish-
op's Directions and Forms (2d Ed.), sections 20-21, 535.
Bishop, in section 21, just referred to, in summarizing the
benefits and advantages resulting from stating the means
applied by the accused in the commission of crimes in one
count, is very careful to state, however, that the statement
must be strictly limited to one, and only one, transaction.
He says:

"This method, namely, charging the offense, whatever it is, in
one count, as committed in all the ways known to the law and not
inevitably inconsistent with one another, within the probable range
of the proofs, and directing the jury that they may find a verdict of
guilty on being satisfied of the truth of so much of the allegation as
constitutes the offense, is abundantly sustained by the authorities;
while it is practically superior, above all comparison, to the cum-
bersome indictment of many counts. *Let it be borne in mind that
what is thus to be set out is simply one transaction, which, and only
which, is to be given in evidence to the jury.* The charges therefore is
homogeneous. The prisoner, the counsel, the court, the jury, all have
before them the one thing and no more." (Italics ours.)

If thus but one transaction is referred to, the accused
cannot require the state to elect as between different means
that it is alleged caused the death. The whole case is sub-
mitted to the jury, and it is for them to say from the evidence
what the means were that were used and what one caused
death, and, if any one caused it, the charge is sustained.
The doctrine just stated is illustrated in the foregoing cases
under various circumstances. If the cases are critically
examined, it will be found that in all of them it is made ap-
parent that only one transaction was intended to be charged
and described. In other words, it is clear from the cases that

the pleader intended to state, and did state, that the means alleged in the indictment or information were the means used by the accused to kill the deceased, and that the charge referred to and covered but one transaction. This is especially illustrated in the cases of *State v. Edmundson* and *Commonwealth v. Macloon, supra.* In those cases the means used to produce death were applied during a period of several months, and yet the acts of the accused were treated in the information as a single transaction. This fact is also frequently referred to in most, if not all, of the other cases cited. Moreover, some of the cases also illustrate that different means may be stated in different counts, and, if it is clear that only one transaction is intended to be referred to, the prosecutor is not required to elect between counts, although different means are pleaded in each count. In the case at bar the pleader, however, adopted the method of stating not only different means in different counts, but he also referred to two separate and distinct transactions, one occurring and having been completed on the 26th day of November, and the other occurring and having been completed on the 27th day of the same month. The district attorney recognized this situation when he admitted that the state should elect, but the difficulty is that in adding the third count and upon which the state elected to ask a conviction the pleader simply reiterated the statements contained in the first two counts, and left the matter, in so far as charging two transactions, one occurring on one day and the other upon the next, just as they were in the two counts, which, by the election, were eliminated from the case. The state, therefore, surrendered nothing and the accused gained nothing by such an election. There is one, and only one, ground upon which the court's ruling in denying appellant's second motion can be sustained, which is that the pleader in the third count stated but a single means as causing the death of the deceased, namely, the co-operation of two distinct causes which produced the mortal sickness from which it is alleged the deceased languished and finally died. The pleader had a right to accuse appellant of having used one, two, or more means, or of causing death by applying

two distinct means as co-operating causes, the joint effect of which produced death. As we have seen, the pleader could have availed himself of charging all these means by pleading in a certain way. He did not choose to do so, but specifically alleged that the appellant committed an assault upon the deceased and used certain means on one day, and that he committed another assault and applied certain other means on another day, and that the effect of the means so described co-operating together produced a mortal sickness which caused death. The effect of the allegations in the third count is that the two causes, one arising from the beating and bruising and the other from the administering of the poison, co-operating together, produced death. This being so, the court was right in not requiring the state to elect, since in legal effect there was but one cause of death alleged, namely, the joint effect of the beating and bruising co-operating with the effect produced by the poisoning. It is also clearly shown by the record that the trial proceeded upon this theory. The physicians testified that death did not result from either the beating alone, or from the effects of the poison alone, but that it was caused by the co-operating influence of the effects of both, and this thus constituted but a single, and the real, cause of death. This, in legal effect, is just what was charged as the means of death in the third count. But, notwithstanding this, the court ruled and instructed the jury that they could find the appellant guilty if they believed from the evidence beyond a reasonable doubt that the deceased died from the effects of the beating and bruising and kicking alone, or from the effects of the poison alone, or from the combined effects of both. As we have seen, this charge might have been proper if the information had been different, but, in view of the language contained in the third count of the information, there was no distinct charge left upon which to base a finding that death was caused except from the co operating causes, which in and of itself excluded the charge that either one of those causes produced, or could have produced, death. The court therefore erred in charging the jury as aforesaid.

But the court further erred in instructing the jury as stated above, because there was no evidence before the jury upon which they could find the appellant guilty of having committed murder by the means of beating, kicking, and bruising. The first count was eliminated from the case, and, as we have seen, the third count did not contain a sufficient statement that the beating, kicking, and bruising produced death. In the third count it was charged that death, was caused by two co-operating causes. This being the charge, it would have to be sustained by proof in order to convict. In referring to this point, the author of Wharton on Homicide (3d Ed.), section 563, at page 848, says: "But an indictment charging the death to have been occasioned by two co-operating causes, if the evidence fail to support one of the causes, is insufficient." From this it further follows that, although there had been a sufficient charge left in the information that death resulted from the beating and bruising, yet, there being no evidence in support of this charge, the instruction that a conviction could be based thereon cannot be sustained. The Attorney General recognizes this difficulty, and, to overcome it, suggests in his brief that the charge of the court can be sustained upon the theory that the jury were authorized to disregard the testimony of the doctors with respect to the cause of death, and that they were authorized to find that the effects of the beating and bruising alone caused death, notwithstanding the testimony of the doctors to the contrary. If there had been no autopsy from which it was made to appear that there were no internal injuries or evidences attributable to the beating and bruising, and that death was not caused by the beating, the jury might, perhaps, have been justified in finding that the beating resulted in internal injuries from which deceased died. While it is true that ordinarily a jury, after considering and weighing purely opinion evidence if contrary to their own knowledge and experience, may disregard such evidence entirely, but they may not do so where witnesses, although testifying as experts, testify to symptoms and conditions actually seen and observed by them. Where

witnesses, although experts, describe to the jury the conditions as they have observed them, and the effects attributable to such conditions, and such evidence stands unimpeached, neither the court nor the jury have any more right to ignore such evidence than they would any other credible evidence in the case. Verdicts and findings must be based on some evidence, and, when the evidence fails, all fails. In view of the testimony of the doctors who testified for the state, there was therefore no evidence upon which the court could authorize the jury to find that death was caused from the effects of the beating and bruising alone. The instruction which directed the jury that they might so find was, therefore, without support in the evidence, and constitutes reversible error.

Counsel for appellant, however, insist that there is no evidence to support a finding that the accused administered poison to the deceased, and hence, in view of what we have already said upon the other branch, no evidence upon which the case can be submitted to a jury upon any theory. In view of some facts that are disclosed in the application for a new trial, which it is not necessary to specifically set forth, the evidence on a subsequent trial may be somewhat different from what it was at the last one. While the evidence that the accused administered poison to the deceased is quite unsatisfactory and inconclusive, yet, in view that the evidence upon that question may be different upon a retrial of the case, we are unwilling to direct the trial court in advance whether the case should be submitted to a jury or not on that branch of the case. Upon a new trial, with all the evidence before the court, it will no doubt be able to determine whether the case ought to go to the jury or not. For the reason, therefore, that a new trial is necessary, we refrain from a further discussion of the evidence upon that branch of the case.

At the trial, the state produced what purported to be a dying declaration of the deceased, which was reduced to writing and duly signed and sworn to by her. The state also offered in evidence in connection with the written statement of the deceased oral declarations which it is claimed she made *in extremis* a short time after the written state-

ment was made.   Appellant now urges that the court erred
in admitting these oral statements, and insists that the court
should have permitted nothing but the written statement to
go to the jury.   The law is that dying declarations,
otherwise competent, may be either in writing or oral,          **4**
and where there are both written and oral declarations,
if otherwise competent, either one or both may be given in
evidence.   (21 Cyc. 981; Wharton on Homicide [3d Ed.],
section 644; *State v. Schmidt,* 73 Iowa, 469, 35 N. W. 590;
*State v. Carrington,* 15 Utah, 480, 50 Pac. 526.)   The court
committed no error in admitting either the written or oral
declaration referred to.

It is also asserted that the court erred in admitting in
evidence what the deceased said to Mrs. Wunderlich at the
time of the beating, when she asked Mrs. Wunderlich to call
the police.   It is insisted that the statement made by the
deceased, which we have set forth in full in the statement
of facts, was not admissible (1) because not part of the *res
gestae,* and (2) because it was not made in the presence of
appellant.   The statement was made while appellant's mal-
treatment of the deceased was still in progress.   Deceased
had just arisen from the kitchen floor after having been
"knocked down" by appellant and left the kitchen, where
appellant was, and, after going through the door of the
kitchen onto the rear porch, she, in calling to Mrs. Wunder-
lich, made the statement complained of.   It appears from
the evidence that the kitchen door was not closed after the
deceased had passed out, and appellant was in the act of
closing it when the deceased returned to the kitchen, when
he again seized her and threw her down on the kitchen floor,
and kicked her, at which time she uttered the exclamation
that appellant was killing her.   It is thus made to
appear that what she said to Mrs. Wunderlich was          **5**
in fact said while the acts of appellant were still in
progress.   The statement or exclamation made by the de-
ceased was thus a part of the *res gestae,* and admissible
upon that ground.   Moreover, the evidence shows that the
deceased was but a short distance from the kitchen door when

she called to Mrs. Wunderlich; that she immediately returned to the kitchen, and thus frustrated appellant's attempt to close the kitchen door against her. There is also evidence to the effect that the children, who were in the kitchen, heard the deceased, in speaking to Mrs. Wunderlich, "calling for the police," that appellant was nearer to the deceased than any of the children, and therefore he must have heard all that the deceased said, and therefore what was said by her was, in effect, said in his presence. Under these circumstances, appellant has no cause for complaint and the court did not err in permitting the statement to go to the jury.

It is further asserted that the court erred in admitting in evidence the testimony of a certain witness who testified for the state on the preliminary hearing, and who was cross-examined by counsel for appellant at the hearing aforesaid. At the time the accused was tried in the district court, the witness in question was absent from the state of Utah, and was a resident of the state of Oregon, all of which was made to appear. By section 4670, Comp. Laws 1907, the testimony given at a preliminary hearing in a homicide case must be reduced to writing. The testimony may, however, be taken in shorthand in the form of questions and answers by a stenographer duly appointed by the magistrate before whom the preliminary hearing is held, and, when so taken, the stenographer is required to transcribe or extend his shorthand notes into longhand and certify that the transcript contains a correct statement of the testimony and proceedings in the case. The transcript, when certified to as aforesaid, is by the statute declared to be *prima facie* a correct statement of the testimony. If the accused is held to answer to the district court, the stenographer is by the statute required within ten days after the close of the hearing to transcribe his stenographic notes into longhand, attach his certificate thereto, and file the same with the clerk of the district court of the county in which the accused is held for trial; the stenographer in all cases being required to file his original shorthand notes with the clerk aforesaid. By subdivision 4 of section 4513

it is, in substance, provided that where the testimony of a witness taken at a preliminary hearing is taken in the presence of the accused, and the witness is cross-examined by him, or he is given the opportunity to cross-examine, and the testimony is taken in the form of questions and answers, then, in case the witness is dead, insane, or cannot be found within the state, his testimony so taken may be read in evidence on the trial of the case by the state. But appellant objected to the reading of the testimony, first, upon the ground that no sufficient foundation was laid to admit it in evidence; second, that the admission of the testimony was in violation of the constitutional provision that the accused must be confronted by the witnesses against him; third, that the stenographer's certificate to the transcript was insufficient; and fourth, that the statute had not been complied with, for the reason that the original stenographic notes were not filed with the clerk within the time fixed by section 4670, *supra.*

The objection based upon the first ground stated above is untenable. The evidence was ample to justify the court's conclusion that the witness was a nonresident of and absent from this state at the time of trial. This was sufficient to admit the evidence under the rule adopted by this court in *State v. King,* 24 Utah, 482, 68 Pac. 418, 91 Am. St. Rep. 808. The contention that appellant's constitutional rights were disregarded by admitting the testimony of the absent witness is answered by this court adversely to his contention in *State v. King, supra.* Nothing need be added to what is there said why the admission of the testimony is not in violation of appellant's constitutional rights. The subject of the admission of the testimony of witnesses taken at preliminary hearings who may be dead, insane, or absent from the state is also discussed and the cases upon the       **7, 8** subject, both *pro* and *con,* under statutes and in the absence of statutes, are collated in notes to the cases of *State v. Nelson,* 1 Am. & Eng. Ann. Cas. 471, and *State v. Spencer,* 13 Am. & Eng. Ann. Cas. 973. The court did not err in admitting the evidence upon this ground.

The third ground of objection, namely, that the certificate of the stenographer attached to the longhand transcript of his notes was insufficient, was, in our opinion, entirely over-come by the amendment of the certificate at the trial by the stenographer. We can see no force to the contention that the court had no power to permit the stenographer to amend a mere formal defect in his certificate. The statute does not prescribe a form of certificate, but simply requires that the stenographer shall certify that his longhand tran-script is "a correct statement of such testimony and proceed-ings in the case." The certificate in this case was "that the above and foregoing is a full, true, and correct transcript of all the proceedings therein" in the case. If by a technical interpretation of this certificate it can be said that the statute was not literally complied with in the first instance by omit-ting to state that the transcript contained a correct state-ment of the testimony, this defect was supplied by the stenographer at the trial by amending the cer-tificate. We can conceive of no good reason, and counsel for appellant have suggested none, why such a formal defect of the certificate is not curable by amendment. It is in the nature of curing a defect in a return of process, or in any other formal certificate, which, in practice, is per-mitted as a matter of course. We think, as a matter of law, the formal defect was curable by amendment.

This brings us to the last ground of objection, namely, that the statute (section 4670) "had not been complied with by the filing of the original stenographer's notes" within the time fixed by said section. It is not quite clear from the reading of the section whether the original stenographic notes are required to be filed within ten days or not. The statute provides that, if at the preliminary hearing the ac-cused is held for trial, the stenographer shall, "within ten days after the close of such examination, transcribe his said shorthand notes into longhand, and certify and file the same with the clerk of the district court of the county in which the defendant shall have been examined, and shall in all cases file his original notes with said clerk." If we assume that the

foregoing language implies that the original notes must themselves be filed within the time stated, the question still remains whether the time limit is of the essence and thus mandatory, or whether it is merely directory. We confess that we can see no good reason for holding that, unless the original stenographic notes are filed within ten days, therefore the record of the proceedings had at a preliminary hearing is made unavailing for the purposes contemplated by the statute. It requires but slight reflection to convince the ordinary man that what is required by section 4670 is as much for the benefit of the accused as it is for the state. If the witnesses for the state alone testify at the preliminary hearing, and such is usually the case, especially in homicide cases, the accused obtains access to a full and reliable transcript of their testimony, and at the trial of his case he is thus afforded the opportunity to call the attention of the court and jury to any discrepancy in the testimony of any witness as given at the trial when compared with what he testified to at the preliminary hearing. In this very case the accused availed himself of this advantage, and it seemingly did not occur to his counsel that the transcript of the testimony could not be used for any purpose until the state desired to use it for the purpose of showing what the testimony of the absent witness was. It is quite true that it is possible that, under certain circumstances, a transcript or record may be admissible for one purpose, and yet not for all other purposes. Such, however, as we view the matter, is not the case here. It seems to us that, if the filing of the original stenographic notes within the ten days is essential for one purpose, it is equally essential for every purpose that the transcript of the testimony taken at the preliminary hearing may be used for. It would seem, therefore, that the provision fixing the time of filing the original stenographic notes is directory merely, and a failure to comply with that provision will not affect the right of either the state or the accused to use the transcript of the testimony taken at the preliminary hearing for the purposes contemplated by the statute, if it is otherwise

competent, or invulnerable to other objections. In the case
of *State v. Morgan,* 27 Utah, 103, 74 Pac. 526, this court held
that the provision with regard to the time of filing the notes
aforesaid is directory merely. True, this was held to be so
upon an objection other than the one now before the court,
but, if that provision is directory for one purpose, it logically
and necessarily must be held to be so for all purposes. More-
over, the filing of the original notes can be required but for
one purpose, namely, to enable counsel for the state and the
accused to determine whether the longhand transcript of
the testimony and the proceedings corresponds with the orig-
inal notes. Beyond this, they can perform no function what-
ever. It would seem, therefore, that, unless the statute in
terms prevents the use of the transcript unless the original
stenographic notes are filed, the courts cannot do so unless
it is made to appear that the accused is in some way preju-
diced, or is thereby prevented from having a fair and im-
partial trial. It is our opinion, therefore, that in view that
the appellant made no claim of prejudice because the original
notes were not filed within the ten days mentioned in the
statute the court committed no error in permitting the notes
to be filed at the time of trial, nor in permitting the tran-
script of the testimony of the absent witness taken at the pre-
liminary hearing to be introduced in evidence.

The next assignment relates to the cross-examination of
appellant. It is strenuously insisted by appellant's counsel
that the court erred in compelling appellant to answer cer-
tain questions propounded to him on cross-examination by
the prosecuting attorney. Appellant exercised his constitu-
tional and statutory right to testify in his own behalf. He
took the stand, and, in answer to certain questions put to
him, in substance, testified that he came home for the noon
meal a little after noon on the 27th day of November; that
he remained at home about thirty minutes, during which
time he ate dinner with the children; that he went to the door
of the middle room in which his wife, at the time, was lying
on the bed, put his left hand on the door casing, looked into
the room, saw the deceased lying on the bed "apparently

asleep;" that he did not go into the room; that he neither then, nor at any other time, put any poison of any kind, or any other substance of any kind, into the glass of water which was standing on the sewing machine, nor did he then, or any at any other time, place any poison of any kind in anything or in any place where the deceased would be likely to get it; that he knew that there were tablets containing bichloride of mercury in the house somewhere, but he did not know that they were in the trunk in the front room where he slept the preceding night; that he obtained the tablets about a year prior to the time in question as an antiseptic medicine for his injured hand; that he obtained them from Rich & Osgood, druggists in Ogden; and that he obtained them and used them under the directions of a doctor. The witness identified the envelope in which the tablets were put up by the druggists when he received them. After testifying as aforesaid, the district attorney cross-examined the witness with regard to the foregoing statements, and then asked him whether he did not have a conversation with the deceased on the evening of the 27th of November, to which the witness answered: "Yes, passed a few words with her then." The district attorney then asked: "What was said about poison, if anything?" Counsel for appellant objected to the question upon the ground that it was not proper cross-examination, and that the question assumed that poison was the subject of conversation. The court overruled the objection and required the witness to answer, and, after stating that there was nothing said about poison "at that time," he said that afterwards, about nine o'clock that night, he had "a little conversation" with the deceased upon the subject of poison. He was then asked whether on the following day, when the deceased was taken to the hospital for treatment, he did not say to her, "Mary, if you make any trouble for me, I'll make trouble for you," and he was compelled to answer the question over counsel's objection that it was not proper cross-examination. After denying having made the statement, he was further asked whether at that time he did not state: "This is a damned nice country. A woman can do anything she wants

to and be protected, but a man can't do anything." The witness, over the same objection, was required to answer the question, which he did by denying the statement. He was further compelled to state on cross-examination whether there was any trouble with the mouth and gums of the deceased, and whether they were bleeding or not, and whether the deceased in referring to her condition did not say to him that she wanted him to see what he had done, and that she requested him to examine the bruises upon her body as she was lying in bed on the night of the 27th. After denying these statements and occurrences, he was asked further questions upon the same and similar subjects, all of which he was compelled to answer over the objection aforesaid.

It is strenuously insisted by appellant's counsel that the court erred in permitting the prosecuting attorney to extend the cross-examination as indicated. Counsel, in their brief, in referring to the conversations inquired into on cross-examination, say: "There is nothing in the conversation itself which was detrimental to the defendant, and yet any lawyer of experience would have immediately said, "The recitation of that conversation would injure your case, not because that it will tend to prove you guilty, but because the jury will not believe you.'" The contention, therefore, is: (1) That the matters inquired into by the district attorney were not proper cross-examination; and (2) that, in view of the effect that the questions and answers had upon the jury the rulings of the court were very prejudicial, although the matters testified to by appellant in themselves did not possess any probative force either for or against him. In view of our statute, did the court err in requiring the appellant to answer the questions as part of the cross-examination?

Section 5012, Comp. Laws 1907, especially provides that the rules of evidence in civil cases apply to all criminal actions, except as otherwise provided by the Code. Section 5015 provides that, "if a defendant offers himself as a witnesss, he may be cross-examined by the counsel for the state the same as any other witness." Section 5012 thus gives us the rule to be followed, and section 5015 in express

terms provides that the accused, if he becomes a witness, must be treated on cross-examination the same as any other witness. In view of the provisions of these sections, the test the court must keep in mind is: Would the particular question be proper cross-examination if the same were propounded to any other witness who had testified to the same facts that the accused has testified to? If the question would be proper cross-examination if asked of any other witness it would likewise be if propounded to one on trial for a criminal offense, or vice versa. The rule is that as to whether the accused has made certain admissions, or has made statements of material facts against himself, and everything which may contradict, modify, explain, or make clearer, limit, or enlarge the meaning of the statements made by him while testifying with respect to any subject of which he has testified, may be inquired into on cross-examination. The inquiry must, however, be limited to the subject-matters gone into by the witness in his testimony in chief. Sometimes, and under peculiar circumstances, it is a matter of some difficulty to determine the precise limits of the subject-matters gone into by the witness, and, for that reason, if for no other, courts sometimes differ with regard to what is and what is not proper cross-examination. Where the accused, as a witness, denies that he committed or was connected with the commission of the criminal act or acts constituting the offense for which he is being tried, the cross-examination ordinarily must be permitted to extend to the whole range of facts which in some way are related to the transaction constituting the offense. But where, as in the case at bar, the witness limits his statements to negating or explaining mere isolated facts, or merely states what occurred at a particular time and place, then what took place at such time and place ordinarily constitutes the subject-matter upon which the witness testified, and the cross-examination should be limited to that subject.

We are of the opinion that all the questions asked by the district attorney on cross-examination, excepting those which referred to the beating and bruising and to the condition of the accused which was assumed was caused by the beating, were proper cross-examination under the rules we have just stated. The court therefore committed no error in requiring the appellant to answer the questions as above referred to. But we cannot see upon what theory the court's rulings can be sustained by which appellant was required to answer the questions relating to the conversations and statements that were inquired into respecting the beating and bruising and deceased's condition attributable thereto. Appellant had neither directly nor indirectly denied, nor in any way negatived his connection with the beating. He left the subject untouched in his examination in chief. The subject, therefore, was not opened up for cross-examination. Nor can it be seriously contended that the latter questions were proper as affecting appellant's credibility, or the weight that should be given to his testimony. The cross-examination, therefore, came within the rule announced in *State v. Shockley,* 29 Utah, 25, 80 Pac. 865, 110 Am. St. Rep. 639. Mr. Justice McCarty, in referring to the subject now under consideration, in that case, at page 48 of 29 Utah, at page 873 of 80 Pac., says: "Nor did it (the testimony of the defendant) directly or remotely refer to any fact or circumstance testified to by him, or that came within the range of his examination in chief." Upon the other branch, as to whether the questions were asked for the purpose of affecting the weight to be given to his testimony, the Justice says: "But it is apparent that the questions complained of in this case were not asked, nor was the evidence sought to be elicited thereby, for any such purpose." What was true in that case is true here, namely, that the questions with regard to the beating and the condition of the deceased attributed thereto were not proper for any purpose, and hence the court erred in requiring appellant to answer those questions. See, also, *State v. Williams,* 36 Utah, 273, 103

Pac. 250. While under the rule as adopted by some courts the defendant in a criminal proceeding, when he takes the stand as a witness, is held to waive his constitutional rights with regard to testifying against himself, yet both the better reason and the weight of authority are in favor of the rule we have adopted. In the recent case of *People v. Smith,* 9 Cal. App. 644, 99 Pac. 1111, numerous cases upon this subject, including other California cases, are collated. The last case referred to is squarely in point upon the question presented in this case. See, also, *State v. Duncan,* 38 Am. St. Rep. 894, and *Evans v. O'Connor,* 75 Am. St. Rep. 318, where, in notes, the cases *pro* and *con* upon this subject are reviewed. In California, as in this state, the subject of cross-examination is regulated by statute. While the phraseology of the California statute is somewhat different from ours, yet, when the two sections of our statute to which we have referred are considered together, there is in our opinion, in legal effect, no difference between the California statute and our own; and such, in effect, is the holding of the California court, as appears from the decisions to which we have referred.

We are aware that the case of *State v. Shockley, supra,* has been severely criticised by an eminent legal writer on evidence. In the fifth volume of Wigmore on Evidence, the distinguished author of that work, in a note to section 21, at page 10, in referring to the Shockley Case, says: "This is perhaps the most glaring example of our modern failures of justice to be found in the records of a decade. The defendant, who had in July, 1903, three times robbed street cars in Salt Lake City, was charged with the murder of two passengers in a fourth attempted robbery of a car in January, 1904. The defendant took the stand and confessed all the facts, endeavoring to make exculpation by declaring that he had only intended to 'try to hit his arm.' The verdict was reversed by the majority solely on two erroneous rulings of evidence—first, because the claim of witness' privilege was required to be made by the defendant himself and not his counsel; and, secondly, because of improper cross-

examination to past misconduct. Not only were the court's
rulings easily supportable on orthodox principles, but the
Supreme Court majority opinion gave not even one word's
consideration to the question whether the alleged errors
should have affected the verdict. On a perusal of the testi-
mony of the defendant, full of self-justifying ethics of a
reckless desperado, it is hard to say whether one is more
aghast at the coldbloodedness of the robber in taking the lives
of his innocent victims, or the cold-bloodedness of the Su-
preme Court in mechanically grinding out a reversal without
a regard to the demands of justice." Referring to the same
case again, at page 235, in the same volume, it is said: "The
decision makes confusion in the law, and helped to set free a
confessed villian." In view that neither the facts nor the
reasons upon which the majority opinion in the Shockley
Case is based are correctly reflected in the statement made
by our distinguished critic, we are not only justified, but
owe it as a duty to ourselves and to the profession generally,
to correct the manifest errors into which the author by a
misapprehension of the real facts that controlled the deci-
sion in that case has been betrayed. Referring to the state-
ment that the decision was the means of setting free a "con-
fessed villian," it no doubt would require a little more evi-
dence than the foregoing statement to convince the villian in
question that he was set free. The fact is that a legal con-
viction followed the reversal of the judgment, and the villian
is now serving a life sentence at hard labor. We do not
refer to this fact, however, for the purpose of showing that
the criticism is for that reason not well founded. We refer
to it for the sole purpose of showing that, where a critic is
careless in his statement of facts in one particular, he may
be, and usually is, found to be so with regard to other par-
ticulars. A comparison of the real facts as they appeared
in the Shockley Case with what they are either stated or
assumed to be by Prof. Wigmore in his criticism leaves no
room to doubt the correctness of the foregoing observation.
As a further illustration, we refer to the distinguished au-
thor's statement that the defendant "had in July, 1903, three

times robbed street cars in Salt Lake City," as wholly un-
justified as a statement of fact. There was no evidence in
the Shockley Case that the accused had committed the rob-
beries attributed to him prior to the one he was being tried
for. On the contrary, the record shows that the prosecuting
attorney merely asked the accused whether or not he had not
committed such robberies, and, when the accused claimed his
privilege and declined to answer the question, the district
attorney, very improperly, plied the accused with further
questions in which the attorney assumed and stated in the
presence of the jury that the witness declined to answer
because a negative answer was impossible. It was in this
connection that the question arose as to whether counsel or
accused could claim the privilege. By a series of questions
adroitly put to the accused he was placed in such a light
before the jury that it would have been far better for him if
he had either denied or admitted the assumed facts, and
had not claimed his privilege. If such a course may be
pursued when a witness claims his privilege, of what virtue is
the much vaunted privilege? Instead of shielding him from
being compelled to give evidence against himself, the shield
is turned into a sword, and the effect upon the jury is worse,
if possible, than an admission of the crime which is assumed
in the question would be. In this manner, therefore, and
by this method, the accused is prevented from having a fair
and impartial trial, since a jury whose passions are inflamed
are utterly incapable of thenceforth judging his case with
impartiality. But the distinguished author would, of course,
not contend that, where a certain individual was on trial for
an offense committed in January, evidence that he had com-
mitted some other offense in the preceding July would be com-
petent upon the issue of guilt or innocence. As substantive
proof no court would admit such evidence for that purpose,
and no law writer would justify its admission. But the dis-
tinguished author contends that the error in the Shockley
Case consists in holding that the facts sought to be elicited
by the questions of the district attorney were proper upon
the ground that they tended to affect the credibility of the

accused as a witness. This presents the crux of the Shockley
Case.

We venture the assertion that no one can even cursorily
read the majority opinion in that case and not have the
conviction forced upon him that the court neither attempted
to nor did follow any rule of cross-examination of a defend-
ant in a criminal proceeding excepting the rule which is
supported by both reason and the weight of authority. Under
our statute any witness, for the purpose of affecting his
credibility, may be asked whether or not he has previously
been convicted of a felony. If he answers "Yes," this ends
the inquiry; and, if he answers "No," the record of his
conviction is conclusive against him. He must, however,
answer the question, since to admit a former conviction can-
not expose him to further prosecution for that offense. But
may a witness' credibility also be affected or destroyed by
mere insinuations or assumptions on the part of the cross-
examiner that the witness has committed crimes generally,
and, if the witness denies the assumptions or claims his
privilege, may he be further plied with questions by which
it is further assumed that he denies because he dare not
admit or claims the privilege because he cannot truly deny?
If such a course may be pursued, then no witness is safe
from attack, and his credibility may be seriously affected,
if not destroyed, by mere insinuations and accusations with-
out a scintilla of proof that he has committed any offense
or has in any way been connected with its commission.
Moreover, in asking generally whether crimes have been
committed by the witness, the prosecutor's good faith may
well be questioned, since it is well known that, in case a
witness denies having been charged with or of having com-
mitted any crime of which he has not been convicted, no
proof with respect to such charge can be presented. From
this the conclusion is inevitable that such questions, as a rule,
are asked for the sole purpose of prejudicing the defendant
before the jury, and, if that is not the purpose, such never-
theless is the usual effect. It was upon these grounds, and
no other, that the majority of this court condemned the ques-

tions and rulings in the Shockley Case. If the position of
our esteemed critic is correct, then any person by becoming
a witness may be condemned of any crime without a hearing,
and the presumption that all men are innocent until their
guilt is established beyond a reasonable doubt is a mere fic-
tion to be heeded only in the instructions to the jury, but
may be entirely disregarded upon the trial of the case.

The professor's answer to this, however, seems to be that,
if the admission of the evidence was supportable upon what
he is pleased to call "orthodox principles," it makes no dif-
ference whether it is desired for a legitimate or an illegiti-
mate purpose. Moreover, as we construe the professor's
criticism, he, in effect, holds that, when one accused of crime
in effect confesses the acts constituting the offense, no error,
however gross, can be prejudicial in his case, and hence any
court that under such circumstances will reverse a judgment
of conviction is quite as cold-blooded as the criminal, and
hence like he should be condemned. While we think the
doctrine that mere technical errors should not in any case
work a reversal is well founded and always should be ob-
served, yet we cannot, without qualification, subscribe to the
further doctrine that prejudicial error is legally impossible
against one who while testifying in his own behalf admits
the facts constituting the offense charged against him and
for which he is on trial, and who has no explanation to offer
except some matters which constitute no defense. Even in
such a case the minds of the jurors may by improper ques-
tions and insinuations on the part of the prosecutor be so
inflamed against the accused that a fair and impartial trial
at their hands is as impossible as it would be to reflect any-
thing but a distorted image from a convex or concave mirror.
According to our distinguished critic, if the evidence sought
to be elicited is proper according to some "orthodox prin-
ciples," all else is immaterial. In this connection it may be
said that it may well be that a conviction is in accordance
with "orthodox principles," and thus without a flaw in the
state of Illinois, and yet not without error in the state of
Utah. Courts must have due regard for local statutes which

may affect both procedure and substantive law. As we have seen, the two sections to which we have referred clearly restrict the scope of the cross-examination of one accused of crime, yet Prof. Wigmore intimates that these sections were ignored in the Shockley Case because the examination there was not permitted to be conducted under the orthodox rule that, when the accused becomes a witness, he waives the constitutional injunction that he shall not be compelled to testify against himself. The language of our statute is so clear that no construction is permissible. In civil cases, when the cross-examination is carried beyond its legitimate scope, the cross-examiner makes the witness his own, and, under the provisions of the foregoing statute, when this occurs in a criminal case, the accused is in legal effect compelled to testify against himself, and his constitutional rights are thus ignored. To prevent this result is the manifest purpose of our statute. If this be not its purpose, it has none. But there is still another local statute which plays a very important part in homicide cases where the charge is murder in the first degree. Section 4162, which fixes the penalty for murder in the first degree, provides: "Every person guilty of murder in the first degree shall suffer death, or, upon the recommendation of the jury, may be imprisoned at hard labor in the state prison for life, in the discretion of the court." The legal effect of this section is that it conditionally provides for two penalties for murder in the first degree. In *Calton v. Utah,* 130 U. S. 83, 9 Sup. Ct. 435, 32 L. Ed. 870, the Supreme Court of the United States, in construing the foregoing provision, held that it is the duty of the trial court in every case where the charge is first degree murder to instruct the jury that it is their province to recommend that the punishment be imprisonment for life, that any accused person has a right to have the jury so instructed, and that the right is a substantial one, which cannot be ignored. In this state, therefore, upon a plea of not guilty, although the accused confesses the facts constituting first degree murder at the trial, he still has the right to have the jury recommend that the punishment be other than death. If, as the Supreme

Court of the United States holds, this is a substantial right, then it follows that the accused has the right to have the recommendation based upon legal evidence which is limited to the crime for which he is on trial. If the minds of the jurors may be influenced by showing that the accused was guilty of other offenses for which the penalty amounts to no more than a term in the state prison, then the jury may easily be induced to permit the death penalty to be inflicted because lesser crimes have been insinuated but not proved against the accused, and not because the jury conscientiously believe and are satisfied beyond a reasonable doubt that the accused should be permitted to suffer death for the sole reason that he committed the particular offense for he was tried. The accused is entitled to the unbiased judgment of the jury upon this question, and the court may, in case he thinks the accused should suffer death, disregard the recommendation.

But it would seem from Prof. Wigmore's criticism that one of the principal offenses committed by the majority of this court in reversing the judgment in the Shockley Case was that the court did not make clear wherein the defendant was prejudiced by the rulings of the trial court. Here again Prof. Wigmore seems quite insincere. In his criticism it is assumed that the defendant was guilty of at least three other crimes which were committed by him in the preceding year. This assumption of fact is based entirely upon the mere insinuations and accusations of the prosecuting attorney, and the refusal of the defendant to answer the accusations upon the ground of privilege. If any proof of the fact were necessary that such insinuations and assertions of crime are prejudicial to the accused, Prof. Wigmore, wittingly or unwittingly, has furnished it. If mere insinuations or accusations are sufficient proof of guilt for an eminent writer on the law and rules of evidence, why should they not be sufficient for ordinary laymen who sit as jurors? If the mere fact that a court feels impelled to disagree with the theories of the eminent critic and is unwilling to permit mere insinuations to stand as proof will induce him to enter upon a most fervid and intemperate criticism of the court, what will the

effect of such insinuations be upon the minds of ordinary men who abhor crime and who sit as jurors in the case? They, like Prof. Wigmore, will condemn the accused, regardless of proof or consequences.

But, entirely apart from the foregoing observations, Prof. Wigmore's criticisms by reason of their intemperate character are valueless. His criticisms are of the kind which engender heat, not light; they irritate, but impart no information. They appeal to the passions rather than invite cool reflection, and in the long run will result in betraying courts into committing errors rather than to help them in avoiding them. It may be that our criminal procedure is out of date, and that by reason of the present methods of administering our criminal laws some of those who commit crimes may escape. Courts, however, can neither change the laws nor the rules of evidence. In their daily task of dealing with concrete cases they must apply both substantive law and procedure so as to reflect justice. Courts must have some regard for consequences in particular cases, and for that purpose the rules must receive a practical application. Critics like Prof. Wigmore revel in mere abstract theories. Their theories may or may not be practical in view of all the facts and circumstances of the particular case, and because the court finds it impossible to follow a particular theory to the same extent and under different circumstances in all cases the court must as a matter of course be condemned by the critics. But, whether our criminal laws and procedure be changed or not, the underlying principle that no one may be convicted without a fair and impartial trial by an impartial jury will always remain. Whatever the future may develop, one thing is certain—that no court that is worthy of the respect and confidence of the public will affirm a judgment of conviction where it is clearly made to appear that the conviction is against law and is the result of prejudice and unfair means used at the trial. To reverse a judgment of conviction without sufficient reasons may be a grievous blunder and a wrong against society, but to affirm a conviction which is the result of unfair means and prejudice

engendered at the trial is more than a wrong—it would be a crime.

Lest we be again misunderstood, we repeat that we have not held, and do not now hold, that under our statute the credibility of one on trial for a crime when a witness may not be attacked in the same manner as any other witness. What we do hold is that while a court may seriously err in its rulings in so far as it affects the rights of a mere witness without necessarily influencing the jury but that such interference with one on trial for a crime may, and ordinarily does, influence the judgment of jurors, and when it is manifest from the record that such has been the case, the verdict and judgment cannot be permitted to stand. While in the case at bar the court erred in permitting the cross-examination as herein indicated, yet, in view that the judgment must be reversed upon other grounds, it is not necessary to pass upon the question whether this error was of such a nature that in view of the whole record we would reverse the case upon that ground alone.

The contention that the court erred in refusing to grant a new trial for the reasons urged by counsel, in view of the conclusions reached, needs no further consideration. While one or two of the grounds argued by counsel, when considered in connection with other phases of the case, are more or less serious, yet, in view that the case must be retried, and as the alleged errors cannot arise in the same way on a retrial, it is not necessary for us to either discuss or pass upon them. All other assignments have been carefully considered, and we are of the opinion that the court has committed no error in regard to them.

The judgment is reversed, with directions to the district court to grant a new trial, and to proceed with the case in accordance with the views herein expressed.

McCARTY, J., concurs.


STRAUP, C. J.

I concur in the result. The information contained three counts. The first charged a homicide by beating and bruis-

ing. The second by poisoning. The third by the combined
and co-operating causes of both. When the state rested,
the court, on the defendant's motion, required it to elect.
It elected on the third count. By such action the first and
second counts were withdrawn. The case was submitted to
the jury on the third count only. The defendant requested
the court to charge that, before the defendant could properly
be convicted, the jury must find that both the poisoning and
the beating combined to cause the death of the deceased,
and as in the third count alleged, and that it was not suf-
ficient that a portion of the jury believed that the death was
caused by the beating only, and a portion by poisoning only.
The request was refused. The court charged that the defend-
ant could be found guilty of murder if the jury believed
the death was caused "by either one, or a combination of
both" beating and poisoning, as in the third count alleged.

There is no allegation in the third count that the death
was caused by beating alone. Neither is there an allegation
that it was caused by poisoning alone. The allegations in the
third count in this regard are: That by the beating on the
26th day of November and the administering of the poison
on the 27th day of November the deceased "became mortally
sick and distempered in her body," and languished until the
8th day of December, when she died. When the court told
the jury that they might find the defendant guilty of causing
the death by beating alone, the jury had the right to assume
that there was sufficient evidence to justify such a finding.
So did they when the court told them that they might find
him guilty of causing the death by poisoning alone. We
have no means of determining whether the verdict was
founded upon one or the other cause, or upon both. If it
was founded upon the cause of beating alone, as the court
told the jury they might find, the verdict lacks support in
the evidence. As pointed out by Mr. Justice FRICK, there is
not sufficient evidence to support a verdict on that cause alone.
Neither from the testimony of the witnesses, nor from the char-
acter of the discolorations or bruises on the deceased's body,
nor from any external or internal conditions of her body,

as testified to by all the witnesses in the case, was the jury justified in such a finding. To the contrary, every physician in the case, both on the part of the state and the defendant, testified that the effects of the beating did not cause the death, and that there were no external nor internal conditions of the body indicating such a cause.

Nor in my judgment was there sufficient evidence to justify a finding that the death was caused by mercurial poison administered by the defendant—the particular kind of poisoning alleged—and the only poison claimed by the state that the defendant administered to the deceased. The conviction of the defendant on this cause rests alone upon circumstantial evidence. The administering of the poison by the defendant, and the death from such a cause, may, of course, be shown by circumstantial evidence. As has often been said by the courts, and the text-writers, it is not to be expected that witnesses should be called to state that they saw the deadly poison administered by the prisoner or mixed up by him openly before them, nor is it essential to show that a quantity of poison sufficient to cause death was found in the body, if other sufficient facts lead to the conclusion that the death was occasioned by poisoning. However, in determining the question of sufficiency of the evidence, when a conviction rests alone upon circumstantial evidence, proper regard must be had to the elementary rules of evidence governing that kind of evidence and the principles upon which they are founded. Circumstantial evidence, frequently termed "indirect evidence," consists in reasoning from facts which are proved to establish such as are conjectured or asserted to exist. In the case of direct evidence the facts apply directly to the *factum probandum.* Circumstantial evidence is proof of a minor fact, which, by indirection, logically or naturally demonstrates the *factum probandum.* 3 Enc. Ev. 63. That is, from the proof of certain facts in a given case may be inferred other connected facts which usually and reasonably follow according to the common experience of mankind. Hence, one of the most essential rules of circumstantial evidence, recognized by the courts and text-writers generally, is

that facts claimed as the basis of a legal inference must be proved, and connected with the *factum probandum*. That is, the inferences, by which it is sought to establish a fact conjectured or asserted to exist, must be drawn from proven facts, not from mere inferences. Another well-recognized rule is that, before it can be said that circumstances prove anything, they must agree with and support the hypothesis sought to be proved; and in a criminal case they must not only concur and be consistent with and point to the defendant's guilt, but they must also be inconsistent with any other reasonable conclusion or hypothesis, including that of innocence. Hence it has many times been said by the courts that "circumstantial evidence in a criminal case is of no value if the circumstances are consistent with either the hypothesis of innocence or the hypothesis of guilt; nor is it enough that the hypothesis of guilt will account for all the facts proven. Much less does it afford a just ground for conviction that, unless a verdict of guilty is returned, the evidence in the case will leave the crime shrouded in mystery." (3 Ency. Ev., 92.)

It was shown by the testimony on the part of the state that in a trunk kept in the house, and to which the defendant and the deceased had equal access, were kept tablets of bichloride of mercury, and a box or bottle of some kind of medicine or drug used to produce miscarriages or abortions. The mercury tablets were procured by the defendant something more than a year before the alleged homicide upon a prescription for an injury to his hand. The box or bottle was procured, just when is not shown, by the deceased from or through the advice of a lady relative. After the death of the deceased, this box or bottle was taken from the trunk by a sister of the deceased, Amanda Ward, who was a witness for the state and a very hostile witness against the defendant. She gave it to the physician who attended the deceased in her last illness, and who was also a witness for the state. The physician testified that he returned it to Mrs. Ward. She testified that he did not. Neither claimed to have possession of it, or any knowledge of where it was, at the time of the trial. The nature of the contents of the box or bottle were not disclosed, except,

as testified to by Mrs. Ward, that it contained some drug or medicine obtained by, or given to, the deceased to produce abortions or miscarriages. The deceased on different occasions asserted to her sister and to others that because of her ill health, the defendant's cruelty towards her, and their poverty she would not give birth to more children. At moments of despondency she also threatened self-destruction. The deceased for some time had been in ill health. On the 26th day of November the defendant, without cause, became angered, and cruelly beat and kicked her, the details of which are referred to by Mr. Justice FRICK. She afterwards went downtown shopping. The defendant went to his work. That night she, with some of the children, slept in one room, and the defendant, with others, in another room where the trunk was. The next morning she arose and got breakfast. The defendant ate his breakfast and went to work. About ten or eleven o'clock of the forenoon of that day the deceased felt so ill that she sent for her sister. When she arrived, she found her preparing the noonday meal. As testified to by her sister, the deceased was then menstruating, and was sick and weak, and looked "very delicate and pale." She advised her to go to bed and lie down. About fifteen or twenty minutes before twelve o'clock she went into a room adjoining the kitchen, and lay down on the bed. Her sister, after making some examination of her, departed. Before lying down, the deceased obtained a glass of water and placed it on the sewing machine near the bed. The defendant returned from his work some time after twelve o'clock for his noonday meal. He entered the kitchen, where his eldest daughter was finishing the preparation of the meal. After talking and playing with some of the children, he asked where the deceased was. He was told that she was lying down in the adjoining room. According to his testimony, and that of his daughter, he stepped to the door leading to the room where the deceased was, placed his hand on the door casing, looked in, and, thinking the deceased was asleep, walked back, sat down, and ate his lunch. According to the oral dying statement of the deceased, she was lying on the bed with her eyes closed, and,

on opening them, she saw the defendant leaving her bedside and walking out of the room. After he ate his lunch, he went back to work. In her oral dying statement she further stated that, after the defendant left the room, she took a drink from the glass of water near the bed, and that afterwards "she was taken much worse and continued to be worse from that time on." At about two o'clock she began vomiting, and purging blood, strings of blood, and greenish looking matter, and complained of much pain. The daughter sent for a neighbor, Mrs. Wunderlich, and also for the deceased's sister, Mrs. Ward. Mrs. Wunderlich, a witness for the state, testi-fied that, when the deceased vomited, she noticed, among other things, greenish looking matter, and smelled the odor of oil of savin. It was shown that oil of savin has a strong and peculiar odor, and, when taken in sufficient quantities, will produce miscarriages or abortions, and that it is an irritant poison. Mrs. Wunderlich also testified that in giving the deceased water to drink she, thinking that the water in the glass near the bed was stale, threw it away, left the glass to be washed, and got fresh water for her; that the glass emptied by her was about one-quarter full; that she noticed no sedi-ment in the glass and nothing unusual about the water, except it looked stale. After the deceased's sister arrived a physi-cian was telephoned for at about 2:30 o'clock. He sent some medicine—what kind is not shown—and visited the deceased at about seven or seven thirty in the evening. He found her "in a good deal of distress, was nauseated, was vomiting some time, and was purging from the bowels, complained of pain." At noon of the next day the deceased was removed to the hospital, where she died on the 8th day of December. An autopsy the next day and a chemical analysis of different parts of the body a few days thereafter were made, but no trace of mercury was found. The membranes and tissues of the stomach and intestines were found congested and in-flamed, which conditions, as testified to by the physicians and the chemist, were indicative of the effects of an irritant poison, and that bichloride of mercury was such a poison. But they also testified that oil of savin, and other drugs used

to produce abortions and miscarriages, were also an irritant poison, and, if taken in sufficient quantities, would produce the same conditions found in the stomach and intestines, and would occasion the same symptoms of vomiting and purging as were manifested by the deceased. It was further made to appear, and as stated by Wharton & Stille in their work on Medical Jurisprudence, that oil of savin "has a strong, peculiar and heavy odor, and a nauseous, resinous, and bitter taste. . . . When administered in large doses, signs of irritant poisoning are manifested, such as heat at the stomach, epigastric and abdominal pains, vomiting of greenish matters, abundant and often bloody stools, flow of saliva, and, in fact, the well-known signs of gastro-intestinal irritation," and that "after death there are found, in general, undoubted evidences of inflammation of the stomach and intestines," and that the strong odor is quite distinct in the vomit and urine. True, the autopsy did not disclose any condition of pregnancy, but the physicians testified that the deceased might have been ten or fifteen days in pregnancy, and all indications thereof removed by an accelerated menstrual flow.

Upon this evidence it is contended by the state that it is demonstrated that the deceased died of mercurial poisoning, and that the poison was administered to her by the defendant at about noon on the 27th day of November, when he stood at the doorway of, or went into, the room where the deceased was lying on the bed, and by then and there dropping a bichloride of mercury tablet in the glass of water standing on the sewing machine near her bed. It is conceded by the state that, if the defendant did not then place bichloride of mercury in the glass of water, there is no evidence to show that he administered any poison to the deceased. It is also conceded that he did not then go into the room or to the trunk where the mercurial tablets were, but it is conjectured by the state that he took some of them from the trunk when he arose that morning and before he went to work, or the night before, and had them about his person when at noon he returned from work for his noonday meal. To convict the defendant of causing the deceased's death by poisoning, the state was there-

fore required to prove that the deceased died of mercurial poisoning, and that such a poison was administered to her by him.   There being no trace of mercury found in her body, the fact of death caused by mercurial poisoning was sought, and is claimed, to be established by other proven facts— the inflamed and congested condition of the membranes and tissues of the stomach and intestines, and the symptoms of vomiting and purging and of pain manifested and complained of by the deceased.   But upon the evidence adduced by the state such proven facts equally well point to the cause of death by an irritant poisoning of a drug used to produce abortion.   The proven facts of the state equally well point to two hypotheses, one consistent with the defendant's guilt, the other with his innocence, in which case the circumstantial evidence of the fact sought or claimed to be established is, if not valueless, insufficient to support it.

Even though it should be assumed that the cause of death by mercurial poisoning was sufficiently established, yet it was also necessary to show that the defendant administered the poison.   Again, that fact was also sought, and is claimed, to be established by other proven facts.   The proven facts which it is claimed by indirection logically or naturally demonstrate the *factum probandum*—the administering of the poison by the defendant—are:   Bichloride of mercury tablets were found in the trunk to which the deceased and the defendant had equal access, and which were there for more than a year, and conceded not to have been procured for any wrongful or unlawful purpose; the deceased, sick, very delicate and pale, was lying on the bed with her eyes closed; the defendant, when he returned from his work, entered the kitchen, inquired where the deceased was, and, on being told that she was lying down in the adjoining room, went to the doorway of or into her room, looked at her, walked away, sat down in the kitchen, ate his lunch, and went back to work; after the defendant was at the doorway or in the room, the deceased drank from the glass of water procured by herself, whereupon she became worse, and at about two o'clock began

38 Utah—4

vomiting and purging, and complained of pain. There is no
logical nor natural connection between the proven facts and
the *factum probandum,* the dropping of the mercurial tablets
in the glass of water by the defendant while he was at the
doorway or in the deceased's room. This is not a case where
a person without ailment or complaints of pain, or in an
ordinarily normal condition, drinks or eats something, and is
suddenly or shortly thereafter made sick and caused to suffer
pain. The deceased, when she lay down on the bed, and
before it is claimed that the defendant placed the poisonous
tablets in the glass, was from some cause, according to all the
evidence, a very sick woman, and was in a weak, pale, and
trembling condition. Her symptoms of pain, of vomiting
and purging, are equally attributable to causes other than that
of her drinking water out of the glass after the defendant
was at the door of, or left, her room. The defendant's going
to the doorway, or in the deceased's room under the circum-
stances disclosed is not an unusual nor a suspicious circum-
stance. It is so usual and natural that it does not even sup-
port nor agree with the hypothesis of guilt, and much less
is not inconsistent but wholly consistent with innocence.

The facts that the defendant took bichloride of mercury
tablets from the trunk, and that the deceased drank mercurial
or other poison from the glass themselves rest, not upon any
proven facts, but upon mere inferences. That is the fact that
the deceased drank poison from the glass of water is itself
only an inference deduced from the facts that after she drank
from the glass she became worse, began vomiting and pur-
ging, and had pain. Yet from such inferences it is sought
to infer the further fact, the *factum probandum,* the placing
of the tablets in the glass of water by the defendant, and
thus we have an inference deduced, not from a proven fact,
but from a mere inference, and have an inference upon an
inference.

I cannot yield assent to the proposition contended for by
the state that "as to the poisoning it was necessary on the part
of the state to satisfy the jury of two things: First, that
the defendant had possession of, or access to the poison; sec-

ond, that he had the opportunity to administer the poison to Mary Vance," the deceased. Nor could I yield assent, if added to these two, were the third, that the deceased died of mercurial poisoning. That is to say, it is not sufficient to sustain a charge of murder by poisoning by the mere proof of facts that the deceased died of poisoning, that the defendant under no suspicious circumstances merely had poison in his possession, or access to the poison, and that he had the opportunity to administer it to the deceased. Bichloride of mercury, carbolic acid, and other antiseptics are not unusual articles found in many households for antiseptic or mechanical purposes. If the contention of the state is sound, should the death of one member of a family having such poisons about the house be caused by such kind of poisoning, every other member of the family who had possession of, or access to, the poison, and had the opportunity to administer it to the deceased, might properly be found guilty of murder. Courts do not, and should not, sustain convictions on such evidence alone. We have been referred to no case supporting such a contention of the state. Neither the case of *Zoldoske v. State,* 82 Wis. 580, 52 N. W. 778, nor the case of *Commonwealth v. Danz,* 211 Pa. 507, 60 Atl. 1070, cited by the state, supports it. Those cases are much stronger in their facts than is the case in hand. In the first it was shown by direct evidence that the candy containing the poison and which was eaten by the deceased was given to her by the defendant; in the other, that the defendant put the poison in the deceased's cup of coffee. So are the cases of the *State v. Van Tassel,* 103 Iowa, 6, 72 N. W. 497, where there was also some direct evidence that the defendant substituted a poisonous drug for the medicine left for the deceased by a physician, *State v. Best,* 111 N. C. 638, 15 S. E. 930, where it was shown by direct evidence that flour, bread, and dough from which the deceased had eaten was in the possession of the defendant and contained poison, and that it was administered to her by him, and in the case of *Speights v. State,* 41 Tex. Cr. R. 923, 54 S. W. 595, where the defendant administered poisonous water to the deceased out of a dipper. A person having bichloride of

mercury tablets about the house, conceded not to have been procured and kept under any suspicious circumstances, nor for any wrongful or unlawful purpose, is one thing. One mixing a deadly poison with candy, bread, water, or other substance, or substituting a deadly poison for medicine left for a patient by a physician, and giving it, or causing it to be given to another, or who gives to another candy, bread, water, or other substance, containing a deadly poison, to be eaten or drank, is quite another thing. Having bichloride of mercury tablets about the house is not an unusual thing. Mixing poison with bread, candy, or other substance to be eaten, or drank, is not only a very unusual thing, but is also inconsistent with innocence. Besides, in the cases referred to, there were in some of them other facts and circumstances and in others admissions, confessions, and conduct of the suspected parties which were not only consistent with their guilt, but which were also wholly inconsistent with their innocence. The case here on the facts is no stronger than the cases of *State v. Bertoch,* 112 Iowa, 195, 83 N. W. 967; *State v. Nesenhener,* 164 Mo. 461, 65 S. W. 230, and *Pitts v. State,* 43 Miss. 472, where the evidence was held insufficient to support a conviction.

The deceased made two written dying statements, one written by her sister, the other written by an assistant county attorney, and signed by the deceased in his presence, and in the presence of a deputy sheriff. In neither statement did the deceased make any reference to any fact or circumstance on the subject of poisoning. Both statements were confined alone to the transaction of the defendant's striking and kicking her on the 26th day of November, and to the things then said and done. After she had signed the statement in the presence of the attorney and sheriff, and after they had departed, the latter called the former's attention to the fact that the deceased in her statement had said nothing on the subject of poisoning, and suggested that they return and ask her about it. They did so. In response to questions asked her on such subject she made the oral statement heretofore referred to. I, of course, think the evidence of such state-

ment was properly admitted. But the fact that no reference to any circumstance of poisoning was made by her in the written statements is significant. Still more important is the fact that, when she was specifically interrogated on that subject, the statement made by her in that regard was of so little consequence. All that was said by her on that subject was that she saw the defendant leaving her bedside, and thereafter she took a drink from the glass of water, whereupon she "was taken much worse, and continued to be worse from that time on." Whether she took a sip, swallow, or what quantity of water was drunk by her from the glass is not made to appear. It was shown by the physicians, and as stated by Wharton & Stille on Medical Jurisprudence, that "immediately after swallowing a poisonous dose of bichloride of mercury there is experienced a strong metallic taste, and a painful spasmodic contraction in the throat." And, as also made to appear, such taste is very pronounced and unusual. It is highly improbable that the deceased could have drunk a sufficient quantity of mercurially poisoned water to produce the claimed corrosive and poisonous effects and symptoms without noticing or detecting the metallic taste, or some unnatural or unusual taste. Yet no word is said by her to the effect that she noticed anything unusual or unnatural about the taste of the water drank by her, nor is there anything said by her that after she drank it she experienced or felt any pain, or any discomfort, except that she "was taken much worse."

There is considerable evidence to show that the defendant treated the deceased with extreme cruelty. But I cannot say that he shall be shot to death because he is not a good man, or because he was a wife beater. The state cannot legally demand the life of the vilest human creature except upon sufficient proof of his guilt of murder. Such proof I think is here lacking. While the state sufficiently demonstrated that the defendant struck and kicked the deceased, it just as clearly demonstrated by all the evidence in its behalf, including the testimony of its physicians, that the effects of the beating and kicking did not and could not have caused the death.

The evident theory advanced by its learned physicians was that the beating and kicking did not cause the death. So, too, did they testify that the poisoning alone did not cause it. When asked what did cause it, they asserted that it was caused by the combined and co-operating causes of both the kicking and the poisoning. When asked how the two could, and probably did, combine and co-operate so as to cause the death, they asserted that the beating and the kicking of the deceased so lowered her vitality that her system could not resist the corrosive and poisonous effects of the deadly poison, and, in effect stated that, if she had not been kicked and beaten and her vitality lowered, the poisoning probably would not have killed her. As well assert that, because of his reduced or lowered vitality, the victim could not resist the penetration of the bullet as it was shot from the gun into his body nor the destructive effects of the muscles and tissues, as it plowed its way through a vital organ. Fire burns. It burns the tissues and the cells of a strong as well as of a weak body; and they alike must also yield to the corrosive and distructive effects of such a deadly poison as bichloride of mercury. I think this is a case of too much conjecture and not enough evidence. I am of the opinion that there ought to be a retrial.

In view of what has been said concerning the Shockley Case, I feel obliged to make but this observation. In that case the principal assigned errors related to the refusal of the court to submit to the jury the issue of self-defense, the rulings made against the defendant subjecting him to a cross-examination respecting past criminal transactions which were separate and distinct from that for which he was on trial, and the holding that immunity from answering such incriminative questions could only be claimed by the defendant himself, and not through his counsel. The majority members of the court held that there was no evidence to justify the submission of the case to the jury on the issue of self-defense, and that, therefore, the trial court committed no error in its refusal to submit the case to the jury on such theory. The dissenting member of the court was of a different opinion.

He held that reversible and prejudicial error was committed by the trial court in such refusal, and on that ground concurred in the judgment of reversal and in remanding the case for a new trial. The majority members of the court held that reversible and prejudicial error was committed by the trial court in the rulings respecting the cross-examination of the defendant, and in not permitting him to claim immunity, through his counsel, from answering incriminative questions relating to past criminal transactions which were wholly separate and distinct from that for which he was on trial. Because of such erroneous rulings the majority members reversed the judgment, and remanded the case for a new trial. On such holding on such ground the dissenting member did not concur. I thought then, and I think now, that the conclusion reached by the majority members was right. Our reasons therefor are stated in the prevailing opinion. The legal principles involved are very simple. They are: (1) When a defendant is a witness, immunity from answering incriminative questions relating to criminal transactions or crimes wholly separate and distinct from that for which he is on trial may be claimed through his counsel; and (2) while a conviction of prior and other offenses may be shown to affect credibility, or impeach the witness, a mere arrest, or specific acts, or past conduct, tending to show the commission of other offenses, may not be shown.

These principles are elementary, and are supported by the clear weight of authority. They were violated by the rulings referred to. No criticism is made of our conclusion holding them erroneous. The criticism made of the case is that we "gave not even one word's consideration to the question whether the alleged errors should have affected the verdict." The criticism does not fairly reflect the decision. We did not reverse the judgment regardless of the question of prejudice. In the prevailing opinion are stated our reasons why we thought the committed errors were prejudicial and harmful and affected the verdict. We there stated that, under our statute, "every person guilty of murder in the first degree shall suffer death, or, upon recommendation of the jury, may

be imprisoned at hard labor in the state prison for life, in
the discretion of the court," and that it was held by the Su-
preme Court of the United States to be reversible error in
the failure of the court to charge the jury the substance and
effect of the statute. The verdict rendered by the jury in
the Shockley Case was "Guilty of murder in the first degree,"
without any recommendation. Upon the court's refusal to
grant the motion for a new trial, it became the imperative
duty of the court to pronounce upon that verdict a judgment
inflicting the death penalty, which was done. In the prevail-
ing opinion, and in speaking of the prejudicial effect of the
erroneous rulings of the court referred to, we said: "What-
ever deposition, if any, there may have been on the part of
the jurors to make the said recommendation, may have been
entirely overcome and removed by reason of these rulings
of the court." That is to say, though the jurors upon all the
evidence in the case were satisfied beyond a reasonable doubt
that the defendant was guilty of murder in the first degree
as charged in the information, and though upon all the evi-
dence there was no substantial conflict on such question, yet,
by reason of the improper cross-examination, the jury may
have been improperly led to the conclusion that the defend-
ant was also guilty of other separate and distinct criminal
transactions and crimes of which there was no evidence, but
which were so vividly and persistently referred to by the
improper incriminative questions on cross-examination, and
for that reason the jury may have refused to make the recom-
mendation that the defendant be imprisoned at hard labor
for life. That is the view we took of it, and for such reasons
we held the erroneous rulings prejudicial and said so. Some
may not agree with us on that, but a reading of the record
in that case clearly shows that the improper cross-examination
strongly tended to produce, and in all probability did pro-
duce, just such effect. After the court had overruled all and
repeated objections interposed by the defendant's counsel to
the incriminative questions, and held with the contention of
the district attorney that the defendant must himself claim
the privilege, and after the defendant had himself claimed

it, and had declined to answer the questions which in themselves were pregnant and teeming with inquiries respecting incriminative conduct and criminal transactions, the court not only permitted the district attorney, over objections, to further inquire of the defendant, and to compel him to answer whether he so declined on the ground that it tended to incriminate him, but the court itself turned to the defendant and demanded of him: "Do you claim that privilege and decline to answer the question on the ground that it tends to incriminate you and subject you to punishment for a felony?" And when the defendant thereupon answered, "I decline to answer the question upon that ground," the district attorney, still not satisfied that the privilege and immunity had yet been sufficiently claimed, immediately asked the defendant, "Upon the ground it tends to incriminate you?" And so each time, on three or four occasions, when such incriminative questions were asked, such proceeding was substantially repeated; and, after the defendant had declined to answer such questions which were in themselves replete and freighted with inquiries respecting incriminating conduct and criminal transactions, the defendant was further compelled to answer, to the effect, that he did so decline because to answer the questions would incriminate him and subject him to the punishment for a felony. The baleful effect produced by such proceedings would be no worse had the court turned to the defendant, and said: "If you are guilty of the criminal conduct and offenses so clearly suggested by the questions propounded to you, you need not answer, but, if you are not guilty of them, you must answer. Now with this admonition, do you, or do you not, decline to answer?" The substance of all these matters referred to appears in the prevailing opinion. The criticism therefore made, that we did not consider the question of prejudicial effect of the erroneous rulings, is not founded on truth. Neither the grounds upon which we reached the conclusion that the rulings were erroneous nor upon which we held them prejudicial have, as yet, been criticised. The complaint made that we granted a new trial to a bad man, and did not hold any kind

of a conviction of such a man a proper and legal conviction, is not worthy of notice.